UNITED STATES of America,
Plaintiff,

v.

Dustin Lee HONKEN, Defendant.

No. CR 01–3047–MWB.

United States District Court,
N.D. Iowa,
Central Division.

July 16, 2004.

Alfredo G. Parrish, Parrish, Kruidenier, Moss, Dunn, Montgomery, Boles & Gribble, LLP, Des Moines, IA, for Defendant.

Charles J. Williams, U.S. Attorney's Office, Cedar Rapids, IA, for Plaintiff.

## MEMORANDUM OPINION AND ORDER REGARDING THE PARTIES' PRE–TRIAL MOTIONS ON ADMISSIBILITY OF EVIDENCE

BENNETT, Chief Judge.

### TABLE OF CONTENTS

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................ 976
 A. Background .......................................................... 976
 1. The 1993 case ................................................... 976
 2. The 1996 case ................................................... 977
 B. Procedural Background To The Present Case ........................... 977
 1. Indictments in the present case ................................. 977
 2. Pre-trial motions ............................................... 981

II. LEGAL ANALYSIS .......................................................... 981
 A. The Government's Motions ............................................ 981
 1. Cutkomp's instances of indecent exposure ........................ 981
 a. Arguments of the parties ..................................... 982
 b. Analysis ..................................................... 983
 2. Statements of decedents ......................................... 986
 a. The statements in question ................................... 986
 i. Statements by DeGeus ...................................... 986
 ii. Statements by Nicholson .................................. 987
 b. Admissibility of DeGeus's statements ......................... 987
 i. Arguments of the parties ................................. 987
 ii. Analysis ................................................. 989
 c. Admissibility of Nicholson's statements ...................... 994

 *i. Arguments of the parties* .................................. 994
 *ii. Analysis* .............................................. 995
 3. *Discussion of aspects of the death penalty* ......................... 995
 *a. Arguments of the parties* ....................................... 995
 *b. Analysis* ...................................................... 996
 4. *Exclusion of experts* .......................................... 1000
 B. **The Defendant's Motion** .......................................... 1000
 1. *Evidence of Honken's escape attempt* ............................ 1001
 *a. Arguments of the parties* ...................................... 1001
 *b. Analysis* ..................................................... 1001
 2. *Books seized from Honken's residence* ........................... 1003
 *a. Arguments of the parties* ...................................... 1003
 *b. Analysis* ..................................................... 1004
 3. *The Ecstacy Cookbook* ......................................... 1004
 *a. Arguments of the parties* ...................................... 1005
 *b. Analysis* ..................................................... 1005
 4. *Publications and order form purportedly seized from Honken's
 locker* ........................................................ 1005
 *a. Underlying factual dispute* .................................... 1005
 *b. Arguments of the parties* ...................................... 1006
 *c. Analysis* ..................................................... 1006
 5. *Testimony of former attorney* ................................... 1007
 *a. Arguments of the parties* ...................................... 1007
 *b. Analysis* ..................................................... 1008
 6. *Honken's membership in the Odinists* ............................ 1008
 *a. Arguments of the parties* ...................................... 1008
 *b. Analysis* ..................................................... 1009

*III. CONCLUSION* ..................................................... 1009

In this death penalty case, involving the alleged murder of five witnesses to the defendant's drug-trafficking or other alleged criminal conduct,[1] the parties have now filed a second series of pre-trial motions on the admissibility of various kinds of evidence. The evidence at issue in the present motions is so varied as to defy ready categorization, although the motions do involve questions of the admissibility of both testimonial and physical evidence.

## I. INTRODUCTION

### A. Background

#### 1. The 1993 case

As in the ruling on the first series of pre-trial motions, the background to these motions begins with a survey of the prior prosecutions of defendant Dustin Lee Honken in this judicial district. Honken was first prosecuted for drug-trafficking offenses in this district in 1993 in Case No. CR 93–3019 ("the 1993 case"). As the Eighth Circuit Court of Appeals explained,

> In April 1993, a grand jury in the Northern District of Iowa indicted appellee for conspiracy to distribute methamphetamine. After the disappearance of one or more prospective prosecution witnesses, the government dismissed the indictment.

*United States v. Honken,* 184 F.3d 961, 963 (8th Cir.), *cert. denied,* 528 U.S. 1056, 120 S.Ct. 602, 145 L.Ed.2d 500 (1999).

---

1. The charges on which the government has given notice of intent to seek the death penalty are murder while engaging in a drug-trafficking conspiracy ("conspiracy murder"), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2, and murder while engaging in or working in furtherance of a continuing criminal enterprise ("CCE murder"), also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

Thus, the first prosecution of Honken in this district did not lead to a conviction.

### 2. The 1996 case

Honken was again indicted on drug-trafficking charges on April 11, 1996, this time with co-defendant Timothy Cutkomp, in Case No. CR 96–3004–MWB ("the 1996 case"). Count 1 of the Indictment in the 1996 case charged Honken and Cutkomp with conspiracy, between about 1993 and February 7, 1996, to distribute, manufacture, and attempt to manufacture 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 100 grams or more of pure methamphetamine. Indictment in Case No. CR 96–3004–MWB (N.D.Iowa). Count 2 of the original Indictment in the 1996 case charged Honken with possessing and aiding and abetting the possession of listed chemicals, in violation of 21 U.S.C. § 841(d) and 18 U.S.C. § 2, and Count 3 charged possession and aiding and abetting the possession of drug paraphernalia intending to use such paraphernalia to manufacture and attempt to manufacture methamphetamine and listed chemicals, in violation of 21 U.S.C. § 843(a)(6) and 18 U.S.C. § 2, respectively. *Id.*, Counts 2 & 3. A superseding indictment filed later in the 1996 case restated the first three charges and added a fourth charge of attempting to manufacture methamphetamine. *See* Superseding Indictment in Case No. CR 96–3004–MWB (N.D.Iowa).

Eventually, in 1997, Honken pleaded guilty to the conspiracy charge and the charge of attempting to manufacture methamphetamine, *i.e.*, Counts 1 and 4, and the government dismissed Counts 2 and 3. *See, e.g., Honken,* 184 F.3d at 963. The court held an episodic sentencing hearing on December 15 and 16, 1997, and February 17, 18, and 24, 1998. Honken testified under oath on February 18 and 24, 1998. After the government's appeal of the sentence originally imposed by the undersigned, *see id.,* Honken was resentenced on January 25, 2000. Honken then unsuccessfully appealed his sentence, *see United States v. Honken,* 2 Fed.Appx. 611, 2001 WL 66287 (8th Cir.2001). Honken is now serving his sentence on Counts 1 and 4 in the 1996 case.

### B. Procedural Background To The Present Case

### 1. Indictments in the present case

The present prosecution began with the filing of a seventeen-count indictment against Honken on August 30, 2001, which brought a variety of charges arising from Honken's alleged murder and solicitation of murder of witnesses to his alleged drug-trafficking and other criminal activity, which had, for example, allegedly brought the 1993 prosecution to its abrupt conclusion and had been intended to impede prosecution of the 1996 case. On August 23, 2002, a Superseding Indictment was handed down in this case, amending Counts 8 through 17. *See* Superseding Indictment (docket no. 46). The court will examine the charges in this case in more detail as a prelude to a discussion of the admissibility of certain evidence at trial of those charges.

Counts 1 through 5 of the Superseding Indictment charge "witness tampering." More specifically, each count alleges that Honken "did willfully, deliberately, maliciously, and with premeditation and malice aforethought, unlawfully kill" one of five witnesses: Gregory Nicholson, Lori Duncan (Nicholson's girlfriend), Amber Duncan and Kandi Duncan (Lori Duncan's daughters, ages 6 and 10), and Terry DeGeus. Count 1 alleges that Gregory Nicholson was murdered

　　1) with the intent to prevent Gregory Nicholson from attending or providing testimony at an official proceeding in the Northern District of Iowa, Case Nos. 93–20 M and CR 93–3019 [the 1993

case]; 2) with intent to prevent Gregory Nicholson from communicating to a law enforcement officer of the United States, information relating to the commission or possible commission of federal offenses, including: the distribution of methamphetamine, the manufacture of methamphetamine and conspiracy to distribute and manufacture methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 United States Code, Sections 841 and 846; and 3) with intent to retaliate against Gregory Nicholson for providing information to law enforcement relating to the commission or possible commission of federal offenses, including: the distribution of methamphetamine, the manufacture of methamphetamine and conspiracy to distribute and manufacture methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 United States Code, Sections 841 and 846[;] and 4) with intent to retaliate against Gregory Nicholson for testifying before the Federal Grand Jury investigating the drug trafficking activities of DUSTIN LEE HONKEN and others, which killing is a first degree murder as defined by Title 18, United States Code, Section 1111.

This is in violation of Title 18, United States Code, Sections 1512(a)(1)(A) & (C); 1513(a)(1)(A) & (B) and 1111.

Superseding Indictment, Count 1. Counts 2, 3, and 4 allege that Lori Duncan, Kandi Duncan, and Amber Duncan, respectively, were murdered

with the intent to prevent [them] from communicating to a law enforcement officer of the United States, information relating to the commission or possible commission of federal offenses, that is: the tampering with Gregory Nicholson, a federal witness, in violation of Title 18, United States Code, Section 1512; and DUSTIN LEE HONKEN's unlawful contact with Gregory Nicholson, in con-

tempt of court and in violation of DUSTIN LEE HONKEN's conditions of federal pretrial release in Case Nos. 93–20 M and CR 93–3019 [the 1993 case], in violation of Title 18, United States Code, Sections 3148 and 401, which killing of [each witness] is a first degree murder, as defined by Title 18, United States Code, Section 1111.

This is in violation of Title 18, United States Code, Sections 1512(a)(1)(C), 1512(a)(2)(A), and 1111.

Superseding Indictment, Counts 2–4. Count 5 alleges that Terry DeGeus was murdered

with intent to prevent Terry DeGeus from communicating to a law enforcement officer of the United States, information relating to the commission or possible commission of federal offenses, that is: the distribution of methamphetamine, manufacture of methamphetamine and conspiracy to distribute and manufacture methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 United States Code, Sections 841 and 846, which killing of Terry DeGeus is a first degree murder, as defined by Title 18, United States Code, Section 1111.

This is in violation of Title 18, United States Code, Sections 1512(a)(1)(C), 1512(a)(2)(A), and 1111.

Superseding Indictment, Count 5. The Superseding Indictment includes, in support of Counts 1 through 5, allegations of "Findings under 18 U.S.C. § 3591 and 3592," which the court finds it unnecessary to repeat here, because the government is not seeking the death penalty against Honken on the "witness tampering" charges.

Count 6 charges Honken with soliciting the murder of witnesses, as follows:

Between about June 10, 1996, and February 24, 1998, in the Northern Dis-

trict of Iowa and elsewhere, DUSTIN LEE HONKEN did solicit, command, induce, and endeavor to persuade Dean Donaldson and Anthony Altimus to engage in conduct constituting a felony that has as an element, the use, attempted use, and threatened use of physical force against the person of another in violation of the laws of the United States, that is: 1) the murder of Timothy Cutkomp, with the intent to prevent Timothy Cutkomp's attendance or testimony at a federal drug trial in the Northern District of Iowa, Case No. CR 96–3004 [the 1996 case], in violation of Title 18, United States Code, Sections 1512 and 1111; and 2) the murder of Daniel Cobeen with the intent to prevent Daniel Cobeen from attending or testifying at a federal drug trial in the Northern District of Iowa, Case No. CR 96–3004 [the 1996 case], in violation of Title 18, United States Code, Section 1512 and 1111, with the intent that Dean Donaldson and Anthony Altimus engage in such conduct and under circumstances strongly corroborative of that intent.

This is in violation of Title 18, United States Code, Section 373(a)(1).

Superseding Indictment, Count 6.

Count 7 charges Honken with conspiracy to tamper with witnesses and to solicit the murder of witnesses, as follows:

Between about July 1, 1993, and continuing thereafter, until about 2000, in the Northern District of Iowa and elsewhere, DUSTIN LEE HONKEN did knowingly and willfully combine, conspire, confederate, and agree with other persons known and unknown to the grand jury, to commit the following offenses against the United States:

1. To kill or attempt to kill another person with the intent to prevent the attendance or testimony of that person at an official proceeding, in violation of Title 18, United States Code, Section 1512(a)(1)(A);

2. To kill or attempt to kill another person with the intent to prevent communication by a person to a law enforcement officer of information relating to the commission or possible commission of a federal offense or violations of conditions of release pending judicial proceedings, in violation of Title 18, United States Code, Section 1512(a)(1)(C);

3. To knowingly use intimidation, physical force, threats, or otherwise corruptly to persuade another person with the intent to influence, delay, or prevent testimony of a person at an official proceeding, in violation of Title 18, United States Code, Section 1512(b)(1);

4. To knowingly use intimidation, physical force, threats, or otherwise corruptly persuade another person with the intent to hinder, delay, or prevent communication to a law enforcement officer of information relating to the commission or possible commission of a federal offense or a violation of conditions of release pending judicial proceedings, in violation of Title 18, United States Code, Section 1512(b)(3); and

5. To solicit, command, induce, and endeavor to persuade a person to commit a felony that has as an element the use, attempted use or threatened use of physical force against the person or property of another, specifically violations of 18 U.S.C. § 1512(a)(1)(A) & (C) (murder and attempted murder of individuals with intent to prevent them from testifying or communi-

cating information to law enforcement officials) and 1512(b)(1) & (3) (knowingly using, or attempting to use, intimidation, force, threats or corrupt persuasion of an individual with intent to prevent them from testifying or communicating information to law enforcement officials) with the intent that such person engage in such conduct and under circumstances strongly corroborative of that intent, in violation of Title 18, United States Code, Section 373.

Superseding Indictment, Count 7. Count 7 includes fourteen numbered paragraphs of allegations of "Background to Overt Acts" and thirty numbered paragraphs of allegations of "Overt Acts" in furtherance of the conspiracy, which the court will not quote here.

Honken is also charged in Counts 8 through 12 of the Superseding Indictment in this case with five counts of murder while engaging in a drug-trafficking conspiracy ("conspiracy murder"), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. As they presently stand, each of these Counts charges the "conspiracy murder" of one of five people—Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus, respectively—as follows:

On or about July 25, 1993 [November 5, 1993, as to DeGeus], in the Northern District of Iowa, DUSTIN LEE HONKEN, while knowingly engaging in an offense punishable under Title 21, United States Code, Sections 846 and 841(b)(1)(A), that is between 1992 and 1998 DUSTIN LEE HONKEN did knowingly and unlawfully conspired [sic] to: 1) manufacture 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 2) distribute 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine, intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of [the named individual], and such killing resulted.

All in violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.

Superseding Indictment, Counts 8 through 12.

Counts 13 through 17 of the Superseding Indictment in this case charge Honken with the murder of the same five individuals, respectively, while engaging in or working in furtherance of a continuing criminal enterprise ("CCE murder"), also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. Those charges are as follows:

On or about July 25, 1993 [November 5, 1993, as to DeGeus], in the Northern District of Iowa, DUSTIN LEE HONKEN, while engaging in and working in furtherance of a continuing criminal enterprise in violation of Title 21, United States Code, Section 848(c), intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of [the named individual], and such killing resulted.

The continuing criminal enterprise DUSTIN LEE HONKEN engaged in and worked in furtherance of was undertaken by DUSTIN LEE HONKEN in concert with five or more other persons including, but not limited to, Timothy Cutkomp, Gregory Nicholson, Terry DeGeus, Angela Jane Johnson, and Jeffery Honken. In the organization, DUSTIN LEE HONKEN occupied a position of organizer, supervisor or other position of management. The criminal enterprise

involved the commission of a continuing series of narcotics violations under Title 21, United States Code, Section 801 *et. [sic] seq.* occurring between 1992 and 2000, specifically:

[18 numbered paragraphs omitted].

From this continuing criminal enterprise, DUSTIN HONKEN and others derived substantial income and resources.

All in violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.

Superseding Indictment, Counts 13 through 17.

On June 10, 2003, the government filed its Notice Of Intent To Seek The Death Penalty Under 21 U.S.C. § 848 (docket no. 120), thereby giving notice of the government's intent to seek the death penalty on the "conspiracy murder" and "CCE murder" offenses in Counts 8 through 17. On July 21, 2003, this court denied Honken's motion to dismiss Counts 8 through 17 on the basis of "former jeopardy" in light of his prior conviction in the 1996 case. *See United States v. Honken*, 271 F.Supp.2d 1097 (N.D.Iowa 2003). Therefore, all of the charges in the Superseding Indictment are currently set for trial beginning on August 16, 2004.

### 2. Pre-trial motions

At issue in this ruling are the following pre-trial motions on the admissibility of evidence: (1) the government's May 28, 2004, Motion In Limine Regarding Cutkomp's Instances Of Public Exposure (docket no. 263); (2) the government's June 1, 2004, Request For Hearing And Pretrial Ruling Regarding Admissibility Of Out Of Court Statements Made By Decedents Nicholson And DeGeus (docket no. 264); (3) the government's June 14, 2004, Motion In Limine To Bar Discussion Or Evidence Of Certain Aspects Of The Death Penalty (docket no. 278); (4) the

defendant's June 18, 2004, Motion In Limine (docket no. 288); (5) the government's June 22, 2004 Motion To Exclude Expert Evidence From Michael Gelbort (docket no. 289); and (6) the government's June 22, 2004, Motion In Limine To Exclude Evidence From Lisa Rickert (docket no. 292). All of the motions were eventually resisted.

The court set oral arguments on these motions for July 1, 2004. At the hearing, the United States was represented by C.J. Williams, Assistant United States Attorney, from Cedar Rapids, Iowa, and Thomas Henry Miller, Assistant Iowa Attorney General, from Des Moines, Iowa. Defendant Dustin Lee Honken was represented by Alfredo G. Parrish of Parrish, Kruidenier, Moss, Dunn, Montgomery, Boles & Gribble, L.L.P., in Des Moines, Iowa; Leon F. Spies of Mellon & Spies in Iowa City, Iowa; and Charles Rogers of Wyrsch, Hobbs & Mirakian, P.C., in Kansas City, Missouri. The motions are now fully submitted. The court will consider each motion in turn.

## II. LEGAL ANALYSIS

### A. The Government's Motions

#### 1. Cutkomp's instances of indecent exposure

The government first seeks an order in limine barring defendant Honken from making any reference to, asking questions concerning, or introducing evidence of witness Timothy Cutkomp's past behavior of indecent exposure. The government explains that Mr. Cutkomp, one of the government's witnesses in its case-in-chief, was convicted on March 24, 1995, in the Iowa District Court for Cerro Gordo County of the crime of indecent exposure, a misdemeanor, in violation of IOWA CODE § 709.9; that he was arrested twice for such conduct, but not prosecuted; and that

he admitted at Honken's sentencing hearing in 1997 that he had engaged in numerous other instances of indecent exposure, including a few instances while he was in Arizona in 1992 and many more subsequently in Iowa.

### a. Arguments of the parties

In its supporting brief, the government argues that Cutkomp's conviction for indecent exposure is not admissible under Rule 609(a) of the Federal Rules of Evidence, because the conviction was for a misdemeanor not punishable by more than one year of incarceration, nor is it a conviction for a crime that involved dishonesty or a false statement. The government argues that Cutkomp's admissions concerning other instances of indecent exposure are likewise inadmissible under Rule 608 of the Federal Rules of Evidence, because they are not probative of his truthfulness or untruthfulness. Acts indicating a proclivity to engage in inappropriate conduct, the government contends, are not subject to inquiry, even on cross-examination. Even if evidence of Cutkomp's acts of indecent exposure might otherwise be admissible, the government argues that the court should exclude such evidence pursuant to Rule 403 of the Federal Rules of Evidence, because the evidence is unfairly prejudicial and of little or no probative value. The government argues that the prejudice would be the tendency of the evidence to cause jurors to evaluate Cutkomp's testimony on the inappropriate ground of an emotional response to his acts of indecent exposure. Moreover, the government contends that the evidence does not, in any way, make facts at issue in the case against Honken any clearer. The government contends that inquiry into these incidents would be an unwarranted intrusion into the private life of the witness, because it would embarrass Cutkomp, and would confuse or mislead the jury as to what issues are really on trial here. In its oral

arguments, the government argued that there is no evidence that the instances of indecent exposure had any impact on Cutkomp's memory or perception of critical events and that the instances of such conduct are not themselves probative of any issue in the trial. Thus, the government contends that presentation of this evidence is intended by the defense as a prejudicial misdirection.

Honken filed no timely response to this motion in limine. Instead, on June 28, 2004, well after the deadline for a timely response, and without requesting leave to file an untimely response, Honken filed a resistance to the government's motion. In his untimely resistance, Honken contends that Cutkomp's aberrant behavior corresponded with his drug manufacturing activity and occurred at the time that Honken allegedly intimidated Cutkomp into complicity in the deaths of Nicholson, the Duncans, and DeGeus. Consequently, Honken argues that the evidence of Cutkomp's repeated acts of indecent exposure *are* relevant to his credibility, as they are evidence of his mental health and stability and pertinent to the issues of his memory and the accuracy of his perceptions both during and after the incidents at issue in this case. Honken points out that Cutkomp testified that his acts of indecent exposure provided him with a vehicle for "escaping" from the pressures generated by his drug activities, marital friction, and his relationship with Honken. Therefore, Honken argues that he should be entitled to probe whether Cutkomp's attempts to "escape" also resulted in a suspension of reality, lack of memory, alteration of consciousness, or other mental state affecting the credibility of his testimony. Honken argues that the government cannot show that the relevance of the evidence is outweighed by potential prejudice, because Cutkomp is a critical witness, so that inquiries into his mental and emotional diffi-

culties are guaranteed by the Confrontation Clause of the Sixth Amendment. Honken also argues that Cutkomp and the government have made the subject an appropriate one for cross-examination and jury consideration. In his oral arguments, Honken reiterated that the evidence is probative of Cutkomp's mental and emotional state, memory, and perception of critical events, not least because Cutkomp himself indicated that the instances of indecent exposure eventually caused him to consult a psychiatrist. Moreover, Honken contended that Cutkomp's failure to make full disclosures to law enforcement officers of the instances of indecent exposure is probative of his truthfulness.

### b. Analysis

██ Evidence of a felony conviction is admissible under Rule 609(a)(1) of the Federal Rules of Evidence, subject to the limitations of Rule 403. FED.R.EVID. 609(a)(1); *Jones v. TEK Indus., Inc.*, 319 F.3d 355, 360 (8th Cir.2003). Similarly, evidence of a conviction for a crime involving "dishonesty or false statement" is admissible "regardless of the punishment" under Rule 609(a)(2). FED.R.EVID. 609(a)(2). It is readily apparent that Cutkomp's conviction for misdemeanor indecent exposure is not admissible under Rule 609(a), because it is neither a conviction for a felony nor a conviction for a crime involving "dishonesty or false statement." Thus, no Rule 403 balancing is required as to that conviction; it simply is not admissible pursuant to Rule 609.

██ The government also asserts that Cutkomp's other incidents of indecent exposure are not admissible under Rule 608(b). Rule 608(b) states, in pertinent part, as follows:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness ... may not be proved by extrinsic evidence.... They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ... concerning the witness' character for truthfulness or untruthfulness.

FED.R.EVID. 608(b). The Eighth Circuit Court of Appeals has explained that "Rule 608(b) applies when a party attempts to introduce evidence of prior conduct of a witness that standing alone tends to attack or support the witness's general character for truthfulness." *United States v. Bolzer*, 367 F.3d 1032, 1038 (8th Cir.2004) (citing *United States v. James*, 609 F.2d 36, 46 (2d Cir.1979) ("[Rule 608(b)] was intended to regulate only the use of specific instances of conduct to prove that the witness is a 'bad person' or is a generally untruthful person who should not be believed.")). Thus, the "focus" of Rule 608(b) is "an attack on [a witness's] general character." *Id.* at 1039. The Eighth Circuit Court of Appeals has explained, further, that "[t]he reason for barring extrinsic evidence 'is to avoid holding mini-trials on peripherally related or irrelevant matters.'" *United States v. Elliott*, 89 F.3d 1360, 1368 (8th Cir.1996) (quoting *United States v. Martz*, 964 F.2d 787, 789 (8th Cir.), *cert. denied*, 506 U.S. 1038, 113 S.Ct. 823, 121 L.Ed.2d 694 (1992)), *cert. denied*, 519 U.S. 1118, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997). " 'To the extent that such evidence is ever admissible, the introduction of extrinsic evidence to attack credibility is subject to the discretion of the trial court.'" *Id.* (quoting *United States v. Johnson*, 968 F.2d 765, 766 (8th Cir.), *cert. denied*, 506 U.S. 980, 113 S.Ct. 481, 121 L.Ed.2d 386 (1992)). The actual instances of Cutkomp's indecent exposure, however, do not "standing alone tend[ ] to attack [Cutkomp's] general character for truthfulness." *Bolzer*, 367 F.3d at 1038. Standing alone, they would do no more than suggest that he is a "bad

person." *Id.* (citing *James,* 609 F.2d at 46). Thus, they are not "probative of truthfulness" such that the court should permit inquiry on cross-examination into specific instances of such conduct. *See* Fed.R.Evid. 608(a). Moreover, engaging in a review of extrinsic evidence of specific instances of indecent exposure would run the risk of " 'holding [a] mini-trial[ ] on peripherally related or irrelevant matters.' " *Elliott,* 89 F.3d at 1368 (quoting *Martz,* 964 F.2d at 789). Thus, Rule 608 does not permit the admission of evidence of uncharged instances of indecent exposure.

█ Honken nevertheless asserts that this evidence is admissible, because a witness's mental impairment, including evidence of psychiatric difficulties, is an issue of credibility properly entrusted to the consideration of a jury in weighing the "reliability" of that witness. In support of this contention, Honken cites various cases which he asserts hold that schizophrenia, a history of drug-induced hallucinations, and use of street drugs and anti-anxiety medications are relevant to cross-examination of a witness's credibility. *See Frank v. Brookhart,* 877 F.2d 671, 675–76 (8th Cir. 1989) (schizophrenia), *cert. denied,* 493 U.S. 1027, 110 S.Ct. 736, 107 L.Ed.2d 754 (1990); *United States v. Ramirez,* 871 F.2d 582, 583–84 (6th Cir.1989) (street drugs and anti-anxiety medications), *cert. denied,* 493 U.S. 841, 110 S.Ct. 127, 107 L.Ed.2d 88 (1989); *United States v. Eschweiler,* 745 F.2d 435, 438 (7th Cir.1984) (drug-induced hallucinations), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1188, 84 L.Ed.2d 334 (1985); *see also Andrews v. Neer,* 253 F.3d 1052, 1062–63 (8th Cir.2001) (civil case involving a witness's involuntary commitment for schizophrenia). The court has no quibble with the general proposition that mental impairment is an issue of credibility—and at oral arguments, neither did the government. That is not the end of the matter, however, because Honken attempts to apply the proposition too broadly. The overbreadth of Honken's argument is that Cutkomp's instances of indecent exposure do not, in and of themselves, demonstrate a mental impairment that affects his testimonial capacity in the same way that schizophrenia or habitual drug use, as in the cited cases, might. Thus, despite the correctness of the general proposition Honken asserts—that evidence of a mental impairment is admissible on issues of credibility—evidence of Cutkomp's instances of indecent exposure are, at best, only marginally relevant to his credibility.

█ Indeed, the court concludes that it is not the admission of evidence of the instances of indecent exposure *themselves* that would be justified by Honken's arguments, but the admission of evidence tangentially related to those instances. First, Honken argues that the instances of indecent exposure should be admissible, because Cutkomp testified that those instances were attempts to "escape" that eventually caused him to seek psychiatric help. More specifically, Honken asserts that evidence that Cutkomp engaged in "escapist" conduct and sought psychiatric help can be used to impeach Cutkomp's memory and perception, because, *inter alia,* the Confrontation Clause requires the opportunity to inquire into a witness's mental state, citing *Frank,* 877 F.2d at 676–77. In *Frank,* the court noted that " '[t]he Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion.' " *Frank,* 877 F.2d at 677 (quoting *Delaware v. Fensterer,* 474 U.S. 15, 21–22, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)). Rather, the court held that the Confrontation Clause was satisfied where the defendant "had the opportunity to question [the witness], including inquiries

into her mental state." *Id.* Thus, the opportunity to inquire into Cutkomp's mental state, including the extent to which his "escapist" conduct may have impaired his memory or perceptions, and the extent to which the conduct required psychiatric help, is required to satisfy the Confrontation Clause. Nevertheless, admission of evidence of the *underlying conduct* is not necessary to that inquiry, at least where that conduct did not itself involve deceit or dishonesty. Thus, Honken's first argument for admissibility of the evidence of instances of indecent exposure actually supports the admissibility of an inquiry into whether Cutkomp had a mental impairment potentially affecting his testimonial capacity *of which the instances of indecent exposure were only a symptom;* it does not support the admissibility of evidence of the instances of indecent exposure themselves. Honken may inquire into whether Cutkomp sought psychiatric help and whether the psychiatrist diagnosed a condition affecting his memory, perception, or emotional stability, and also may inquire whether the instances of "escape" impaired Cutkomp's memory or perception, but may only do so without inquiring into the nature of the instances of indecent exposure that may have been intended as "escapes" and may have prompted him to seek psychiatric help. To put it another way, the probative evidence is that Cutkomp attempted to "escape" his situation through misdemeanor conduct and sought psychiatric help, not that he engaged in the *underlying conduct* of indecent exposure. *See* FED.R.EVID. 401 (relevant evidence is admissible, irrelevant evidence is not).

■ Second, Honken argues that Cutkomp failed to disclose all of the instances of indecent exposure to law enforcement officers in response to their questions about his past criminal conduct. This argument goes to whether Cutkomp was untruthful with law enforcement officers

about his past criminal conduct, so that his testimony on other matters might also be suspect. Again, Cutkomp's failure to disclose all of the instances of criminal conduct to law enforcement officers is probative of his character for truthfulness, but evidence of the *underlying conduct* itself is not probative of his truthfulness, and inquiry into that conduct is not necessary to an inquiry about the extent to which he made a full disclosure of instances of criminal conduct.

■ Thus, neither of Honken's arguments warrants admission of the evidence of instances of indecent exposure pursuant to Rule 401 and 402, because *the underlying conduct* is not probative of Cutkomp's mental state, memory, perception, or character for truthfulness. Moreover, even if the underlying conduct were somehow marginally probative of these issues, the court finds that the potential for unfair prejudice from evidence that the underlying conduct was indecent exposure clearly outweighs that limited probative value, warranting exclusion of that evidence pursuant to Rule 403. "Under Rule 403 of the Federal Rules of Evidence, ... '[u]nfair prejudice' ... means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Malik,* 345 F.3d 999, 1003 (8th Cir.2003) (quoting advisory committee's note to Rule 403); *United States v. Lupino,* 301 F.3d 642, 646 (8th Cir.2002) (also quoting the advisory committee note). The unfair prejudice from this evidence, as the government suggests, is that the jury will make a determination of Cutkomp's credibility on the improper, emotional basis of a reaction to the nature of his instances of indecent exposure, not on the basis of any indications of impairment of his memory or perception that might arise from a mental condition of which the instances of indecent exposure

might be a symptom, or on the basis that he failed to make a full disclosure of criminal conduct to law enforcement officers.

At the oral arguments, the court suggested that a "middle ground" or, more accurately, a clear delineation of the extent to which evidence of Cutkomp's instances of indecent exposure are or are not admissible at trial under Rules 608, 609, and 403 might be possible. For example, the court suggested that references could be limited to "a misdemeanor conviction" and "acts constituting misdemeanor violations of the law" that caused Cutkomp to see a psychiatrist or that Cutkomp failed to disclose fully to law enforcement officers. Honken suggested that the underlying problem itself went to Cutkomp's emotional and psychological state, which is an argument that the court rejected above. The government suggested that some link between the conduct and an effect on Cutkomp's memory or perception should be established before the evidence was admissible in any form, but the government cited no authority for that proposition. The court in *Frank* held that the petitioner had failed to adduce any evidence that the challenged witness was suffering from a mental illness during trial. *See Frank*, 877 F.2d at 676 (also finding that the psychiatrist who examined the witness later testified that the witness's mental problems did not affect her ability to perceive events or impair her testimonial capacity). However, in *Frank*, the burden on the party asserting the witness's impairment was discussed in the context of a petition for *habeas corpus* relief from a conviction based on "new evidence" of the witness's schizophrenia, not in the context of some burden on a criminal defendant, *during trial*, to demonstrate that a witness suffers from a mental impairment affecting memory or perception, before evidence of the witness's mental state can be inquired into on cross-examination. Indeed, *Frank* suggests that it is the opportunity to inquire into a witness's mental state that is required to satisfy the Confrontation Clause. *See Frank*, 877 F.2d at 677 (holding that the Confrontation Clause was satisfied where the defendant "had the opportunity to question [the witness], including inquiries into her mental state").

Therefore, the court concludes that the government's motion to exclude evidence of Cutkomp's instances of indecent exposure will be granted to the extent that the parties, counsel, and witnesses may not make any reference to, ask questions concerning, or introduce evidence of witness Timothy Cutkomp's past behavior of indecent exposure, but they may refer to these instances as "a misdemeanor conviction" and "acts constituting misdemeanor violations of the law" that caused Cutkomp to see a psychiatrist or that Cutkomp may have failed to disclose fully to law enforcement officers.

### 2. Statements of decedents

In its second motion, the government seeks a ruling on the admissibility of out-of-court statements allegedly made by decedents Nicholson and DeGeus. The government explains that, prior to his death, Terry DeGeus made several statements to others about the alleged drug-trafficking conspiracy in which he was involved with Honken; where he was going the evening that he disappeared, including specific statements that he was meeting Angela Johnson; and his concerns about being indicted by or called as a witness before a federal grand jury. The government also explains that Gregory Nicholson made various statements to law enforcement officers and testified before a grand jury about his relationship with Honken and their drug-trafficking activities.

#### a. The statements in question

*i. Statements by DeGeus.* More specifically, the government contends that

there will be evidence of the following statements by Terry DeGeus: (1) that De-Geus told Kristin Thompson that he was to pick up methamphetamine from Honken on March 17, 1993, the day that Honken was first arrested on drug charges, that the methamphetamine and some powder for "cutting" the methamphetamine was coming from out of state, and that Angela Johnson owed him $2,400 for methamphetamine; (2) that about a week before his disappearance, DeGeus asked his mother, Joanne DeGeus, if a subpoena had arrived for him, and that on November 5, 1993, he delivered his daughter, Ashley, to his mother's home and told both his mother and his daughter that he was going to meet Angela Johnson; (3) that on November 5, 1993, DeGeus told his daughter, Ashley, that he was going to Angela Johnson's house because she wanted to talk to him, that he was planning to pick up some things from Johnson, and that he would return by 12:30 a.m.; and (4) that on November 5, 1993, at approximately 7:00 p.m., when DeGeus ran into a friend, Rhonda Hanson, at a grocery store in Britt, Iowa, DeGeus told Hanson that he was going to Mason City to see Angela Johnson.

*ii. Statements by Nicholson.* The government also explains that, prior to his death, Gregory Nicholson gave statements to law enforcement officers and testified before a grand jury describing his drug-trafficking relationship with Honken and others. More specifically, the government contends that there will be evidence that on March 17, 1993, while law enforcement officers were executing a search warrant for Nicholson's home, Nicholson was questioned by Investigator Frank Stearns of the Mason City Police Department and that during that questioning, Nicholson made the following statements: (1) that some methamphetamine was hidden in his house and where it was; (2) that he got the methamphetamine from Honken; (3)

that Honken had a "meth lab" in Arizona; (4) that Honken brought up shipments of methamphetamine to Iowa every couple weeks for approximately a year; (5) that Nicholson owed Honken money for the last shipment of methamphetamine; (6) that Honken dropped off methamphetamine to another person unknown to Nicholson in Mason City; (7) that Honken charged Nicholson $1,200 an ounce for pure methamphetamine, but that Nicholson resold it for $1,500 an ounce; and (8) that Honken was coming to Mason City that weekend and that Nicholson was willing to cooperate with law enforcement officers. Nicholson subsequently assisted law enforcement officers with a "controlled buy" of methamphetamine from Honken on March 21, 1993, at which time Honken was arrested. On April 20, 1993, DEA Special Agent David Mizell interviewed Nicholson, at which time Nicholson made statements about his involvement with Honken and about Honken's drug manufacturing and distribution enterprise. Later that same day, Nicholson appeared before a federal grand jury in Cedar Rapids, Iowa, at which time he provided sworn testimony about his involvement with, and knowledge of, Honken's drug manufacturing and trafficking enterprise.

### b. Admissibility of DeGeus's statements

*i. Arguments of the parties.* The government argues that neither the Constitution, federal law, the Federal Rules of Evidence, nor Supreme Court rulings bar the admission of the evidence of DeGeus's statements. More specifically, the government contends that DeGeus's statements are not "hearsay" within the meaning of Rule 802 of the Federal Rules of Evidence, because the government is not offering the statements to prove the truth of the matter asserted. Rather, the government argues that DeGeus's statements to his

mother about a subpoena and to his mother, daughter, and Rhonda Hanson about where he was going on November 5, 1993, will be offered to show that DeGeus "feared the ramifications of being involved in Honken's criminal drug prosecution and that a relationship existed between Terry DeGeus and Angela Johnson." Government's Memorandum In Support Of Government's Request For Hearing And Pretrial Ruling Regarding Admissibility Of Out Of Court Statements Made By Decedents Nicholson And DeGeus (docket no. 264) at 8. If the statements are hearsay, the government contends that they fall within several exceptions, including present sense impression (Rule 803(1)), then existing mental state (Rule 803(3)), and forfeiture by wrongdoing (Rule 804(b)(6)), the last exception premised on the government's contention that DeGeus is unavailable to testify because Honken killed him.

The government also contends that admission of the statements would not violate Honken's confrontation rights under the standards set forth in either *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), or *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). As to admissibility under *Roberts*, the government contends that the statements are reliable, under the circumstances, as merely informational and off-the-cuff, and that DeGeus is plainly unavailable. As to admissibility under *Crawford*, the government contends that the statements were not "testimonial," even if they were "hearsay," so that *Crawford* does not apply. The government also contends that the hearsay exception for forfeiture by wrongdoing trumps or excludes the statements from the requirements set forth in *Crawford*.

At the oral arguments, the government all but dropped its contention that DeGeus's statements were not hearsay and instead focused on the admissibility of the evidence as hearsay. Under questioning from the court, the government also elaborated on the procedures that it asserted would be applicable to admission of DeGeus's and Nicholson's statements under the hearsay exception for forfeiture by wrongdoing. The government suggested a procedure akin to the procedure for determining the admissibility of co-conspirator hearsay statements: the statements would be conditionally admitted, but if the government ultimately failed to establish by a preponderance of the evidence that the witnesses were unavailable because Honken killed them, then the statements would be inadmissible and a mistrial would be all but inevitable. The government candidly stated that, if it could not establish the forfeiture by wrongdoing exception premised on Honken's murder of the witnesses, then its principal charges that Honken murdered these witnesses were also hopelessly weak.

For his part, Honken contends that DeGeus's statements are, indeed, hearsay, because the government *is* offering the statements for their truth, where the government has other less prejudicial and more direct means to establish that there was some kind of a relationship between DeGeus and Johnson. Thus, Honken contends that the statements are offered to show that DeGeus was actually planning to meet Johnson on the night of his disappearance. Honken also contends that the statements are not admissible as present sense impressions, because there is no substantial contemporaneity of event and statement, so that the statements could have been fabrications to point a finger at Honken. Honken contends that the statements also are not admissible under the "state of mind" exception, because they are too uncertain to demonstrate the point they are purportedly intended to prove, and because they do not address matters at issue in the case, where wheth-

er or not DeGeus and Johnson had a relationship is not at issue. Honken next contends that the statements are not admissible on the basis of forfeiture by wrongdoing, because the government has made no more than conclusory assertions, without factual support, that Honken is responsible for DeGeus's unavailability. Honken also contends that the statements should be excluded pursuant to Rule 403 of the Federal Rules of Evidence, because it is impossible to think that the statements that DeGeus was going to meet Johnson would only be used by the jury to determine whether or not DeGeus and Johnson had a relationship.

Just as importantly, Honken contends that admitting DeGeus's purported statements would violate his rights under the Confrontation Clause of the Sixth Amendment. The statements fail the *Roberts* test, he contends, because there are insufficient indicia of reliability, where the reasons for the statements are too uncertain. Honken contends that the statements also fail the *Crawford* test, because they are "testimonial." This is so, Honken contends, because under the circumstances, DeGeus would reasonably have expected his statements to be used prosecutorially: Honken contends that it is entirely possible that DeGeus made statements about a subpoena, not because he feared the consequences of his testimony, but because he was attempting to make statements to implicate his killer in the event that something happened to him, and that he made statements about where he was going on November 5, 1993, for the same reason. In the absence of the opportunity to cross-examine the declarant, Honken contends that such statements violate his confrontation rights. Honken also rejects the government's contention that forfeiture · by wrongdoing makes the *Crawford* requirements irrelevant, because the government makes only conclusory assertions that

Honken is responsible for DeGeus's unavailability.

At the oral arguments, Honken contended that the best procedure to address the admissibility of DeGeus's statements under the forfeiture by wrongdoing hearsay exception was a proceeding outside of the presence of the jury. Honken at first appeared to argue that, in such a proceeding, the government's evidence should be limited to the evidence of the hearsay statements themselves. Honken asserted that the determination of the admissibility of the statements of the deceased witnesses should be made only on the basis of the evidence of their statements, because the admissibility of the evidence raised constitutional questions. To allow consideration of other evidence to support the admissibility of the decedent's statements, Honken argued, would result in a fundamentally unfair trial. Honken then appeared to clarify or change his ground to contend that a *prima facie* showing that the witnesses were unavailable because of his wrongdoing should be limited to a showing with regard to DeGeus and Nicholson *only*, not all of the witnesses that he allegedly killed or intimidated.

■ *ii. Analysis.* The court finds that the government wisely retreated from its assertion that DeGeus's statements are not hearsay, because they purportedly are not offered for their truth. It is all but inevitable that the jury will take statements by DeGeus that he was going to meet Johnson on the night he disappeared for their truth—that is, as evidence that DeGeus *was indeed* going to meet Johnson—and for the government to assert that it does not intend such an inference is disingenuous at best. Equally disingenuous is an assertion that DeGeus's statements that he expected a subpoena would not be offered or reasonably taken as evidence of their truth. Thus, the court

readily concludes that the statements are hearsay. *See* FED.R.EVID. 801 ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Hearsay, of course, is not admissible in the absence of an applicable exception. *See* FED. R.EVID. 802 ("Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress."). The government asserts that several hearsay exceptions are applicable to DeGeus's statements, and the court will consider them in turn.

First, the government asserts that the "present sense impression" exception of Rule 803(1) is applicable. Rule 803(1) provides that "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" is not excluded by the hearsay rule. *See* FED.R.EVID. 803(1). "'The underlying rationale of the present sense impression exception is that substantial contemporaneity of event and statement minimizes unreliability due to [the declarant's] defective recollection or conscious fabrication.'" *United States v. Manfre*, 368 F.3d 832, 840 (8th Cir.2004) (quoting *United States v. Blakey*, 607 F.2d 779, 785 (7th Cir.1979), and also citing *United States v. Beck*, 122 F.3d 676, 681–82 (8th Cir.1997)). "The present-sense-impression exception to the hearsay rule is rightfully limited to statements made while a declarant perceives an event or immediately thereafter, and [the Eighth Circuit Court of Appeals] decline[s] to expand it to cover a declarant's relatively recent memories." *Id.* Thus, statements made after too much time has passed are not admissible under this exception. *Id.* On the other hand, statements made about events that were "part of a single, continuous event" may have sufficient "contemporaneity" to fall within this exception. *United States v. Beck*, 122 F.3d 676, 682 (8th Cir.1997).

Here, it is not clear what "event" DeGeus was purportedly "perceiving" when he made statements that he was expecting a subpoena or that he was going to meet Johnson. *See* FED.R.EVID. 803(1) (the exception applies to a statement describing or explaining an event or condition while perceiving it); *Manfre*, 368 F.3d at 840 (the 803(1) exception is limited to statements while the declarant perceives an event or immediately thereafter). Also, it is unclear what the temporal relationship was between perception of any such event and the statements in question, such that it is difficult to assess whether the statements have sufficient contemporaneity to fall within the exception. *Manfre*, 368 F.3d at 840 (the exception is justified by the belief that contemporaneity of the event and the statement minimize unreliability from defective recollection or conscious fabrication); *Beck*, 122 F.3d at 682 (the exception requires "contemporaneity"). Thus, the "present sense impression" exception is an uncomfortable fit for the statements at issue here. So much so, that the court does not believe that this exception warrants the admission of DeGeus's statements.

The government's contention that the statements fall within the "state of mind" exception of Rule 803(3) fares better. The "state of mind" exception applies to "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." FED.R.EVID. 803(3). Numerous courts have recognized

that this hearsay exception applies to statements of future intention, such as De-Geus's statement of his future intention to meet Johnson. *See, e.g., Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285, 295, 12 S.Ct. 909, 36 L.Ed. 706 (1892) (holding that statements of a declarant's future intent are admissible to show that the declarant acted in conformity with his intention); *United States v. Bishop,* 291 F.3d 1100, 1110 (9th Cir.2002) (same), *cert. denied,* 537 U.S. 1176, 123 S.Ct. 1002, 154 L.Ed.2d 920 (2003); *United States v. Best,* 219 F.3d 192, 198 (2d Cir.2000) (rejecting the defendant's argument that there had to be independent evidence corroborating that the intent actually took place, and holding that, "[i]f relevant, such a statement [of future intention] may be introduced to prove that the declarant thereafter acted in accordance with the stated intent"), *cert. denied,* 532 U.S. 1007, 121 S.Ct. 1733, 149 L.Ed.2d 658 (2001); *see also Horton v. Allen,* 370 F.3d 75, 84 (1st Cir.2004) (holding that, under Massachusetts law, the state-of-mind exception permits the admission of statements that demonstrate the declarant's intent to perform some future act); *Kansas State Bank in Holton v. Citizens Bank of Windsor,* 737 F.2d 1490, 1497 (8th Cir.1984) (noting that Missouri's version of Rule 803(3) applies to statements of future intention). DeGeus's statements of his future intention to meet Johnson on the night he disappeared are, therefore, plainly admissible pursuant to Rule 803(3) to show that he acted in conformity with that intention.

 The government also relies on the "forfeiture by wrongdoing" hearsay exception in Rule 804(b)(6). That exception applies to "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." FED.R.EVID. 804(b)(6). In *United States v. Emery,* 186 F.3d 921 (8th Cir.1999), *cert. denied,* 528 U.S. 1130, 120 S.Ct. 968, 145 L.Ed.2d 839 (2000), the Eighth Circuit Court of Appeals explained that "[t]he rule contains no limitation on the subject matter of the statements that it exempts from the prohibition on hearsay evidence. Instead, it establishes the general proposition that a defendant may not benefit from his or her wrongful prevention of future testimony from a witness or potential witness." *Emery,* 186 F.3d at 926. The court held that the exception is applicable to a missing witness's statements even in a trial for murdering that witness, not just in a trial for the underlying crimes about which the defendant allegedly feared that the missing witness would testify. *Id.* (involving a charge of killing a federal informant in violation of 18 U.S.C. § 1512(a)(1)(C), a charge also at issue here). The court then explained the proper procedure for admitting evidence under such an exception:

Mr. Emery also disputes the procedure that the trial court used to admit this hearsay evidence. He contends that the trial court should have held a preliminary hearing outside the presence of the jury, at which the prosecution would have had to prove by clear and convincing evidence that Mr. Emery procured Ms. Elkins's unavailability. The trial court, instead, admitted the evidence at trial in the presence of the jury contingent upon proof of the underlying murder by a preponderance of the evidence. In doing so, the trial court followed cases dealing with the hearsay statements of co-conspirators: In those cases, evidence is admitted conditionally subject to proof by a preponderance of the evidence that the defendant and the declarant were co-conspirators. *See United States v. Bell,* 573 F.2d 1040, 1044 (8th Cir.1978).

We agree with the trial court that a procedure adapted from the co-conspirator cases was appropriate in the present

context. *See [United States v.] White,* 116 F.3d [903,] 911–12 [(D.C.Cir.) (*per curiam*), *cert. denied,* 522 U.S. 960, 118 S.Ct. 390, 391, 139 L.Ed.2d 305, 306 (1997)]. In so ruling, we are motivated by the functional similarity of the questions involved and by the fact that the repetition necessarily inherent with a preliminary hearing would amount to a significant waste of judicial resources. *See id.* at 914–16. The trial court did not therefore err in denying Mr. Emery a preliminary hearing.

The co-conspirator cases also provide guidance with respect to the issue of the relevant standard of proof. Although one federal appellate court has compared the situation in cases like the present one to the admissibility of in-court identifications that follow tainted out-of-court identifications, and has required proof of predicate facts by clear and convincing evidence, *see United States v. Thevis,* 665 F.2d 616, 629–30 (5th Cir.1982), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303, 458 U.S. 1109, 102 S.Ct. 3489, 73 L.Ed.2d 1370, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982), we again follow the model of co-conspirator cases, and thus require proof by a preponderance of the evidence. *See Bell,* 573 F.2d at 1044. In so deciding, we align ourselves with the majority of circuits that have considered this question. *See, e.g., White,* 116 F.3d at 912, and *[United States v.] Houlihan,* 92 F.3d [1271,] 1280 [(1st Cir.1996), *cert. denied,* 519 U.S. 1118[, 117 S.Ct. 963, 136 L.Ed.2d 849] (1997)].

*Emery,* 186 F.3d at 926–27. Thus, the Eighth Circuit Court of Appeals has expressly rejected the procedure advocated by Honken and adopted the procedure advocated by the government for determining the admissibility of evidence pursuant to Rule 804(b)(6).

The court in *Emery* also expressed its doubt that the admissibility of evidence pursuant to this exception must be made "independently of the hearsay in question." *Id.* at 927. Nevertheless, assuming for the sake of argument that there was such a requirement, the court held that there was sufficient independent evidence in the record in that case "that Mr. Emery 'engaged or acquiesced in wrongdoing that was intended to, and did,' procure [the witness's] unavailability, *see* Fed.R.Evid. § 804(b)(6)." *Id.* Here, the court will await trial to determine whether there is sufficient, independent evidence ultimately to support the admission of the evidence, assuming, as did the court in *Emery,* that such independent evidence is required.

Honken appeared to make the obverse contention in this case, that is, that the admissibility of the evidence *had to be* established by the hearsay itself. Such a contention, the court finds, is unpersuasive. To be admissible, evidence falling within the "forfeiture by wrongdoing" hearsay exception must certainly be relevant to some essential element of a charged offense in order to be offered for its truth, but it defies logic and the Rules of Evidence to imagine that it must also, in and of itself, demonstrate the defendant's forfeiture by wrongdoing. On the other hand, there is some merit to Honken's contention that, in considering whether evidence is admissible under the "forfeiture by wrongdoing" exception, the court should only consider evidence that the defendant procured the unavailability *of the declarant,* not evidence that he procured the unavailability of someone other than the declarant. Such a limitation simply fits the relevance requirement of Rule 401.

Thus, all of the statements by DeGeus identified by the government will be conditionally admitted under the "forfeiture by wrongdoing" hearsay exception of Rule

804(b)(6) and the procedure outlined in *Emery,* unless there is some Confrontation Clause bar to admission of the evidence. The court turns, next, to precisely the question of whether there is any Confrontation Clause bar to admission of DeGeus's statements pursuant to either Rule 803(3) or Rule 804(b)(6).

In its previous ruling on evidentiary matters, this court considered the Confrontation Clause requirements for admissibility of hearsay statements. *See United States v. Honken,* 378 F.Supp.2d 928, ———–———, No. CR 01–3047–MWB, 2004 WL 3418692, Memorandum Opinion and Order Regarding Government's Pre-trial Motions, slip op. at 36–41 (N.D.Iowa June 7, 2004). The court will not repeat the whole of that discussion here. Suffice it to say that, for Confrontation Clause purposes, the admissibility of "testimonial" hearsay evidence is governed by *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), but the admissibility of "non-testimonial" hearsay continues to be governed by *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Somewhat more specifically, in *Crawford,* the Supreme Court established the following bright-line rule:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. *Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.*

*Crawford,* 541 U.S. at 68, 124 S.Ct. at 1374 (emphasis added). This court also concluded that, while *Crawford* did not provide a comprehensive definition of "testimonial," it did provide clues as to the meaning of the term for Confrontation Clause purposes. First, as the Supreme Court explained, "Whatever else the term ['testimonial'] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations," because "[t]hese are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Id.* at 68, 124 S.Ct. at 1374. Second, to the extent that the Confrontation Clause was concerned with out-of-court statements, the Court recognized that the nature of "testimonial" hearsay was that it was in the nature of a formal statement against the accused, with the expectation that the statement would be used against the accused at trial, rather than a casual remark to an acquaintance. Statements made by a witness in an interrogation by law enforcement officers clearly fall within this definition. *Crawford,* 541 U.S. at 50–54, 124 S.Ct. at 1364–65.

Recently, in *Horton v. Allen,* 370 F.3d 75 (1st Cir.2004), the First Circuit Court of Appeals considered the Confrontation Clause limitations on admissibility of hearsay statements falling within the "state of mind" exception. *See Horton,* 370 F.3d at 84. The court first determined that the statements in question were "non-testimonial," because "[t]hey were not ex-parte in-court testimony or its equivalent; were not contained in formalized documents such as affidavits, depositions, or prior testimony transcripts; and were not made as part of a confession resulting from custodial examination. Rather, [the declarant's] statements were made during a private conversation with [another person]." *Id.* Thus, the declarant "did not make the statements under circumstances in which an objective person would 'reasonably believe that the statement[s] would be available for use at a later trial.'" *Id.* (quoting *Crawford,* 541 U.S. at 52, 124

S.Ct. at 1364). This court similarly finds that DeGeus's statements falling within the "state of mind" exception, as identified above, are "non-testimonial," because none were *ex parte* in-court testimony or its equivalent; none were contained in formalized documents, such as affidavits or the like; and none were made as a confession resulting from custodial examination. Rather, they "were made during a private conversation with [acquaintances]." *Id.* In short, DeGeus "did not make the statements under circumstances in which an objective person would 'reasonably believe that the statement[s] would be available for use at a later trial.'" *Id.* (quoting *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364). The court dismisses Honken's contention that the statements should be treated as "testimonial," because he merely speculates that they *could have been* intended for prosecutorial use to finger the likely suspects if he were to disappear. Again, a reasonable person would not have expected his off-the-cuff statements that he was expecting a subpoena and about where he was going on the night he disappeared, made to relatives and acquaintances, to be used later at trial, so that there is no apparent prosecutorial or "testimonial" purpose to the statements. Thus, as in *Horton*, the statements subject to the "state of mind" exception are subject only to the Confrontation Clause requirements set forth in *Roberts. Id.* Also as in *Horton*, this court finds that the "state of mind" exception, even for statements of future intention, is "a firmly rooted hearsay exception," so that admission of the statements "comports with *Roberts*." *Id.*.

▆▆ Similarly, admission of DeGeus's statements pursuant to the "forfeiture by wrongdoing" exception of Rule 804(b)(6) comports with Confrontation Clause requirements. Before *Crawford* was handed down, the Eighth Circuit Court of Appeals observed in *Emery* that "forfeiture by wrongdoing" not only forfeits any hearsay objection, but forfeits the right of confrontation. *Emery*, 186 F.3d at 926. Specifically, the court noted "that it is well established that a defendant's misconduct may work a forfeiture of his or her constitutional right of confrontation, *see Illinois v. Allen*, 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), and that the right of confrontation is forfeited with respect to any witness or potential witness whose absence a defendant wrongfully procures." *Id.* (citing *United States v. Carlson*, 547 F.2d 1346, 1359 (8th Cir.1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977); *United States v. White*, 116 F.3d 903, 911 (D.C.Cir.1997) (*per curiam*), *cert. denied*, 522 U.S. 960, 118 S.Ct. 390, 139 L.Ed.2d 305 (1997), and *United States v. Houlihan*, 92 F.3d 1271, 1279–80 (1st Cir.1996), *cert. denied*, 519 U.S. 1118, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997)). Subsequently, in *Crawford*, the Supreme Court reaffirmed that "the rule of forfeiture by wrongdoing ... extinguishes confrontation claims on essentially equitable grounds." *Crawford*, 541 U.S. at 62, 124 S.Ct. at 1370. Therefore, the Confrontation Clause stands as no bar to the admission of any of DeGeus's statements falling within either the "state of mind" hearsay exception in Rule 803(3) or the "forfeiture by wrongdoing" hearsay exception in Rule 804(b)(6).

The government's motion will be granted as to DeGeus's statements and those statements will be admissible at trial, either pursuant to Rule 803(3), or conditionally, pursuant to Rule 804(b)(6) and the procedures outlined in *Emery*, or both.

#### c. *Admissibility of Nicholson's statements*

*i. Arguments of the parties.* The government's arguments concerning the admissibility of Nicholson's statements are

much more compact. The government again argues that Nicholson's hearsay statements are admissible under the exception for forfeiture by wrongdoing. The government also contends that the statements are admissible under *Crawford*, even though they are "testimonial" hearsay, because equity demands forfeiture of Sixth Amendment rights where the statements qualify for the hearsay exception for forfeiture by wrongdoing. Honken again responds that assertions in support of admissibility of Nicholson's statements under the forfeiture by wrongdoing exception are merely conclusory.

■ *ii. Analysis.* The court agrees that all of the statements by Nicholson in question here are "testimonial." This is so, because all of the statements are in precisely the group of statements that the Supreme Court identified in *Crawford* as plainly "testimonial," including "prior testimony . . . before a grand jury" and statements during "police interrogations." *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374 (statements in these contexts are "testimonial," because "[t]hese are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed"). The statements are admissible over Confrontation Clause objections, whether or not they are "testimonial," to the extent that they are subject to the "forfeiture by wrongdoing" hearsay exception under Rule 804(b)(6). *Id.* at 60–62, 124 S.Ct. at 1370. Thus, these statements will also be conditionally admitted, pursuant to Rule 804(b)(6) and the procedures outlined in *Emery*.

### 3. Discussion of aspects of the death penalty

In its third motion, the government seeks to bar discussion or evidence of certain aspects of the death penalty. More specifically, the government asserts that the court should bar discussion or evidence of the following: (1) the death penalty or other punishment during the guilt phase of the trial; (2) the unavailability of the death penalty as a form of punishment in Iowa under Iowa law; (3) the opinions of State of Iowa officials regarding the death penalty; and (4) the deterrent effect of the death penalty (or lack thereof).

#### a. Arguments of the parties.

In its briefing of this motion, the government asserts that the evidence in question is inadmissible under Rules 402 and 403 of the Federal Rules of Evidence. This is so, the government contends, because punishment is ordinarily irrelevant to determination of a defendant's guilt, and juries are ordinarily so instructed. Thus, interjection of death penalty issues into the guilt phase of the proceedings could mislead or confuse the jury as to the nature of their duties in the guilt phase of the trial, where the jurors' duty is to determine whether the government has proved the elements of each charge. Although the government concedes that it is obviously necessary to discuss death penalty issues during jury selection, there should be no further mention of the death penalty until the penalty phase of the trial, if there is one. The government also contends that discussion of the unavailability of the death penalty under state law and the history of the death penalty in Iowa are also irrelevant and would confuse the jury, because this is a federal proceeding under federal law, and the death penalty is, therefore, available. The government contends that jurors are unlikely to have the sophistication to understand the niceties of a dual-sovereign legal system. Similarly, the government contends that, because this is a federal prosecution, the opinions of state officials regarding the death penalty are irrelevant and that introduction of such opinions at any phase of the trial could only serve to confuse or

mislead the jury. Finally, the government contends that discussion and evidence about the deterrent effect of the death penalty, or the lack of any deterrent effect, is irrelevant and confusing at the guilt phase of the trial and is equally irrelevant to any proper aggravating or mitigating factor at the penalty phase of the trial, not least because Congress has already made the pertinent policy determination to impose the death penalty in certain cases.

At oral arguments, the government stressed its contention that this trial should not become a constant reiteration of death penalty issues that are unrelated to Honken's guilt or innocence or to the presence or absence of proper aggravating and mitigating factors. While the government acknowledges that the court and the parties must deal with death penalty issues raised by prospective jurors during jury selection, the government contends that, thereafter, the death penalty issues identified in the government's motion should be "off the table."

In his written and oral resistances to this motion, Honken contends that, while punishment issues are not generally relevant to determination of the guilt or innocence of a criminal defendant, the government's theory here is that Honken killed witnesses to avoid incarceration. Under those circumstances, Honken contends that he should be allowed to demonstrate that such a supposed motive just does not make sense, where the consequence of killing witnesses would be the potential for far more severe punishment, the death penalty. Thus, Honken contends that the government's theory of the case makes death penalty issues relevant. Honken also contends that the government will call witnesses whose motivation to see the death penalty imposed upon Honken should be exposed. Some cooperating witnesses may believe that cooperation in a death penalty case is more likely to earn them significant reductions in their own sentences for "substantial assistance," while other witnesses may also hope to see Honken suffer the most severe punishment possible, to the point of coloring their testimony toward that end. Honken contends that there is no real danger that jurors will be confused about which issues determine Honken's guilt and which determine the appropriate punishment—indeed, Honken contends that the government's real concern is that jury will understand all too clearly what the government is asking them to do by finding Honken guilty. Honken also contends that there is no way to voir dire potential jurors properly and thoroughly without addressing each of the death penalty issues identified by the government, because juror attitudes and perceptions are likely colored by precisely these issues. Honken represents, however, that he does not intend to introduce expert testimony on the supposed deterrent effect of the death penalty at any penalty phase. However, Honken asserts that he should be able to introduce evidence that sentences other than death deter convicted murderers from future acts of violence (including evidence that death-sentenced murderers are not so deterred), because that evidence is clearly admissible on the aggravating factor of future dangerousness.

### b. Analysis.

Although the government was wise to raise these issues pre-trial, it appears from the parties' written and oral arguments that there is little likelihood that the trial will devolve into a wholesale airing of death penalty policy issues. Rather, both parties concede that the issues identified in the government's motion may, and perhaps must, be addressed during jury selection, but that they are largely irrelevant during the guilt phase of the trial. Honken's defense team represented

that it did not intend to introduce during the guilt phase of the trial evidence of the unavailability of the death penalty as a form of punishment in Iowa under Iowa law; the opinions of State of Iowa officials regarding the death penalty; or the deterrent effect of the death penalty (or lack thereof). The court agrees that such evidence is irrelevant and inadmissible. In *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the Supreme Court identified the problems with such evidence, in a case overturning an Alabama statute that barred jury consideration of lesser-included offenses of a capital murder charge, and thus compelled the jury to focus on the death penalty during the guilt phase of the trial:

> In the final analysis the difficulty with the Alabama statute is that it interjects irrelevant considerations into the factfinding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime. Thus, on the one hand, the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished. On the other hand, the apparently mandatory nature of the death penalty may encourage it to acquit for an equally impermissible reason— that, whatever his crime, the defendant does not deserve death. In any particular case these two extraneous factors may favor the defendant or the prosecution or they may cancel each other out. But in every case they introduce a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case.

*Beck,* 447 U.S. at 642–43, 100 S.Ct. 2382 (footnote omitted). Because there is general agreement between the parties on the relevance of all of the death penalty issues during jury selection, and the irrelevance of most such issues during the guilt phase, the court will concentrate on what appear to be the few remaining differences of opinion between the parties.

■ First, the only "death penalty" issues that the defense team asserts should be admissible during the guilt phase are narrowly tailored ones for purposes of impeachment of the government's theory of the motives for the murders of witnesses and impeachment of the motives of particular witnesses in testifying. Honken's counsel asserted, and the government did not dispute, that the government's theory of the case is that Honken killed witnesses to avoid prison sentences for drug-trafficking. In fairness, then, Honken contends that he should be able to present evidence that this motive just doesn't make sense, where murdering witnesses might expose him to the much more severe punishment of the death penalty. In light of the government's and Honken's arguments concerning the alleged motive for murdering witnesses, Honken has established the relevance and admissibility of evidence that the death penalty is a potential penalty for murdering witnesses. *See* Fed.R.Evid. 401 (definition of "relevant evidence") & 402 (admissibility of relevant evidence).

■ Second, Honken's defense team asserted that it should be able to raise the fact that this is a death penalty case in order to impeach witnesses as to their motivation for and anticipated benefits from testifying. Specifically, Honken asserts that he should also be allowed to raise the fact that this is a death penalty case to impeach cooperating witnesses regarding any belief that they might have that cooperating in a death penalty case is more likely to lead to "substantial assistance" reductions in their sentences. He also asserts that he should be able to raise

the fact that this is a death penalty case to impeach witnesses, cooperating or otherwise, regarding any desire that they may have to see Honken suffer the most severe penalty available under the law. Again, mention that the death penalty is a potential penalty for murdering witnesses may be probative of the motives of witnesses for testifying a certain way and, therefore, is permissible during the guilt phase of the trial. *See* FED.R.EVID. 401 (definition of "relevant evidence") & 402 (admissibility of relevant evidence).

 The court does not see a substantial threat of unfair prejudice to the government's case in admitting evidence during the guilt phase that the death penalty is an available penalty in this case, if that evidence is intended for either of the purposes for which Honken intends to use it. *See* FED.R.EVID. 403 (probative evidence may be excluded on the basis of potential for unfair prejudice). The court finds that there is minimal risk of the prejudice that the government fears—constant reiteration of death penalty issues and distraction of the jury from the issues that they must properly determine during the guilt phase—from the minimal "death penalty" evidence that Honken represents that he intends to offer during the guilt phase. Thus, Rule 403 stands as no bar to admission of this limited "death penalty" evidence during the guilt phase of the trial.

A closer question is presented on the admissibility of any of the evidence identified by the government during the penalty phase, if any, of this trial. Here again, however, Honken represents that he intends to use very little such evidence. Honken represents that he does not intend to introduce expert testimony on the supposed deterrent effect of the death penalty during any penalty phase. However, Honken asserts that he should be able to introduce evidence that sentences other than death deter convicted murderers

from future acts of violence (including evidence that death-sentenced murderers are not so deterred), because that evidence is clearly admissible on the aggravating factor of future dangerousness.

Several courts, primarily in *habeas corpus* proceedings, have addressed the question of the admissibility of evidence of the deterrent effect of the death penalty at the penalty phase of a capital case. The consensus of such decisions appears to be that the evidence is not admissible, even at the penalty phase, because it is not proper mitigating evidence related specifically to the defendant. *See, e.g., Williams v. Chrans,* 945 F.2d 926, 947–48 (7th Cir. 1991) (holding that it was not error to exclude proffered evidence of the lack of deterrent value of the death penalty, because it could not be characterized as mitigating evidence bearing on the defendant's character, prior record, or the circumstances of the offense), *cert. denied,* 505 U.S. 1208, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992); *Granviel v. Lynaugh,* 881 F.2d 185, 189 (5th Cir.1989) (evidence concerning the efficacy of Texas capital statutes was irrelevant to the defendant or his crime and, therefore, was properly excluded as not relevant to mitigating circumstances), *cert. denied,* 495 U.S. 963, 110 S.Ct. 2577, 109 L.Ed.2d 758 (1990); *Martin v. Wainwright,* 770 F.2d 918, 936–37 (11th Cir.1985) (barring such evidence and explaining, *inter alia,* "Evidence concerning whether the death penalty has a deterrent effect, either on potential murderers in general or on a specific category of potential murderers, is not designed to help the sentencer focus on the unique characteristics of a particular capital defendant or crime. Rather, such evidence is designed to persuade the sentencer that the legislature erred, in whole or in part, when it enacted a death penalty statute. Such evidence has never been held, either by the Supreme Court or by this court, to

be 'constitutionally indispensable.' ") (footnote omitted), *modified on other grounds on denial of reh'g,* 781 F.2d 185 (11th Cir.1986), *cert. denied,* 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986); *United States ex rel. Coleman v. Ryan,* 1998 WL 292988, \*39–\*41 (N.D.Ill.1998) (the state trial judge properly excluded evidence of the death penalty's lack of deterrent effect, because it was not proper "mitigation" evidence), *aff'd,* 196 F.3d 793 (7th Cir.1999), *cert. denied,* 531 U.S. 848, 121 S.Ct. 120, 148 L.Ed.2d 75 (2000); *Scott v. Dugger,* 686 F.Supp. 1488, 1511 (S.D.Fla.1988) (the trial court had properly excluded a journalist's anecdotal evidence about executions that he had witnessed and the lack of deterrent effect of the death penalty as irrelevant to any issues properly before the jury at the penalty phase), *aff'd,* 891 F.2d 800 (11th Cir.1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990); *and compare Amrine v. Bowersox,* 238 F.3d 1023, 1032–33 (8th Cir.2001) (holding that admission at the penalty phase of a capital case of a prison warden's testimony that imposition of the death penalty on an inmate for murdering another inmate had had a deterrent effect on inmate-on-inmate murders did not violate the defendant's right to be free from cruel and unusual punishment under the Eighth Amendment or his due process rights under the Fourteenth Amendment), *cert. denied sub nom Amrine v. Luebbers,* 534 U.S. 963, 122 S.Ct. 372, 151 L.Ed.2d 283 (2001); *United States v. Battle,* 173 F.3d 1343, 1348–49 (11th Cir.1999) (distinguishing *Martin,* 770 F.2d at 936–37, to uphold admission of a guard's testimony about how the sentence of the killer of a guard would affect the guards and prisoners as the evidence "was not about deterrence as deterrence is normally discussed in our cases"), *cert. denied,* 529 U.S. 1022, 120 S.Ct. 1428, 146 L.Ed.2d 318 (2000). Indeed, Honken cites no case to the contrary and the court has found none.

Nevertheless, Honken asserts that he should be able to introduce evidence that sentences other than death deter convicted murderers from future acts of violence (including evidence that death-sentenced murderers are not so deterred), because that evidence is clearly admissible on the aggravating factor of future dangerousness. In essence, Honken's argument appears to be that evidence of the lack of deterrence of the death penalty creates an inference that he is more likely to be dangerous in the future if he *is* sentenced to death than if he *is not.* The court is not convinced that evidence that the death penalty does not deter death-sentenced murderers from future acts of violence is any more closely related to this defendant's character, his record, or the circumstances of the offenses charged for purposes of an *aggravating* factor than it is for purposes of a *mitigating* factor, where the lack of such a relationship is the rationale for excluding such evidence in the decisions cited above. *Compare Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (holding that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis in the original). On the other hand, it is not clear what, precisely, the evidence is that Honken would offer in support of this proposition. Therefore, the court will reserve the question of the admissibility of evidence that penalties other than death deter murderers from future acts of violence and that the death penalty does not deter death-sentenced murderers from future acts of violence on the issue of Honken's future dangerousness for consideration only if and when there is a penalty

phase to this trial, and then only if Honken makes a proffer of such evidence, so that the court can properly evaluate it.

With the specific exceptions noted here, the government's motion to bar discussion or evidence of certain aspects of the death penalty will be granted.

### 4. Exclusion of experts

The last two motions by the government presently before the court seek to exclude evidence from defense witnesses Michael Gelbort and Lisa Rickert. At oral arguments, however, the court and the parties were able to resolve these issues. Specifically, as to Dr. Gelbort, a late-designated expert, the court gave Honken to and including July 21, 2004, within which to file a designation of any testimony from Dr. Gelbort concerning a mental disease or defect, with the warning that, if the deadline was not met, Honken would have to offer an "impressive" reason for failing to meet it, or such a designation would be stricken. The court also granted the government one week after such a designation to file a notice of intent to do its own tests of Honken and thirty days thereafter to complete such tests and to file a responsive designation.

Similarly, as to Ms. Rickert, a social worker acting as a mitigation specialist for Honken, the court and the parties agreed that there really was not a problem as to her testimony about the information that she has collected. Ms. Rickert may testify as to the information that she has gathered, but the government may object to her testimony if it exceeds what the government believes to be its permissible scope. The court will entertain any such objection at the time that it is made. Nor

is there a problem if Dr. Cunningham testifies to opinions based on information collected by Ms. Rickert, if the defense establishes that the information collected by Ms. Rickert is the sort of material upon which a psychologist would normally rely.

### B. The Defendant's Motion

Honken's motion in limine seeks to exclude several specific items of evidence, primarily pursuant to Rules 404(b) and 403 of the Federal Rules of Evidence. However, as the court noted at oral arguments, Honken did not attach any of these items of evidence to his motion or otherwise provide sufficient description of the evidence or the circumstances under which it was obtained for the court to have much idea of the relevance or admissibility of the evidence.[2] Although Honken's counsel appeared to indicate that a supplement or addendum had been attached to his motion including or identifying at least some of the evidence in question, the only attachment filed with Honken's motion in limine was a supporting memorandum without any exhibits. Thus, relying on the information provided by Honken's motion and supporting memorandum alone, the court would have little idea of what evidence is at issue or the basis for either admission or exclusion of such evidence. However, the government provided more information about many of the items of evidence in question and addressed all of the items of evidence in more logical groupings, based, for example, on type and provenance. Therefore, the court will rely on the government's categorizations of the evidence, considering each category in turn.

---

**2.** As the court noted at the oral arguments, this is an all-too-common failing of motions in limine generally and such motions in criminal cases in particular. This court refuses to "fly blind." Therefore, in the absence of adequate

identification or description of the items of evidence in question and the circumstances under which they were obtained, the court will ordinarily summarily reserve such evidentiary questions for trial.

### 1. Evidence of Honken's escape attempt

The most contentious issue in Honken's motion in limine became the admissibility of evidence of his purported escape attempt from the Woodbury County Jail in 1997. This court discussed in detail some of that evidence in its prior rulings on other matters in this case. Moreover, at the oral arguments, the court charged the parties to put together sufficient materials concerning the escape attempt for the court to assess its scope and relevance. On July 14, 2004, the court received by facsimile from the government a summary of the information learned by Special Agent William Basler of the Iowa Division of Criminal Investigation during interviews with inmates at the United States Penitentiary in Florence, Colorado. Also on July 14, 2004, the court received by mail from the government copies of the Jencks material for witnesses on Honken's escape attempt. Therefore, the court is well aware of the evidence at issue in this portion of Honken's motion in limine. ·

#### a. Arguments of the parties

Honken contends that evidence that he attempted to escape from the Woodbury County Jail does not make it any more or less likely that he committed the offenses charged in this case and, therefore, is not relevant. Moreover, he contends that such evidence is not admissible under Rule 404(b), because it is irrelevant, does not involve any conduct similar to the crimes charged, and is not "intrinsic" evidence of the crimes charged. He also contends that there is insufficient evidence of escape to warrant misdirecting the jury into a "minitrial" on his alleged escape attempt, because, for example, he was never charged with the crime of escape nor was he even charged with violating a jail rule on the basis of the alleged attempted escape. Honken also suggests that the potential prejudice of such irrelevant or mar-. ginally probative evidence is so substantial as to warrant exclusion of the evidence, because it suggests that he is "dangerous," when no tribunal found that he had attempted to escape. Honken contended at oral arguments that the government is not putting the purported escape attempt in the proper factual context and is not pointing to substantial evidence of a real escape attempt *by Honken.*

The government contends that the evidence of Honken's attempted escape is relevant and admissible, because Honken told several inmates that one of his goals in escaping was to kill witnesses, a prosecutor, and certain law enforcement officers, and to continue his drug-trafficking activities. Thus, the government argues that evidence of the escape attempt is "intrinsic" evidence on Counts 6 and 7. The government also contends that the evidence is admissible under Rule 404(b) to show Honken's motive, intent, preparation, and plan on those charges, and should be admissible in the penalty phase as proof of his future dangerousness. At oral arguments, the government opined that the focus of its evidence about the escape would not be minute details of the manner in which it was attempted, but the statements that Honken made to other inmates about the goal of such an escape.

#### b. Analysis

As the government points out, "cases [in this Circuit] have firmly established that crimes or acts which are 'inextricably intertwined' with the charged crime are not extrinsic and Rule 404(b) does not apply." *United States v. O'Dell,* 204 F.3d 829, 833 (8th Cir.2000). Crimes or acts are "intertwined" if "proof of one incidentally involves the other or explains the circumstances of the other." *United States v. Molina,* 172 F.3d 1048, 1055 (8th Cir.1999), *cert. denied sub nom. Corona*

*v. United States,* 528 U.S. 893, 120 S.Ct. 221, 145 L.Ed.2d 186 (1999). The court agrees with the government that evidence of Honken's escape attempt is "inextricably intertwined" with the charge of soliciting the murder of witnesses in Count 6 and the charge of conspiracy to tamper with witnesses and to solicit the murder of witnesses in Count 7. Indeed, the evidence suggests that Honken pursued an escape attempt precisely for the purpose of murdering or intimidating witnesses and to continue his drug-trafficking activities. In addition, this evidence may also demonstrate Honken's consciousness of guilt. *See United States v. Williams,* 295 F.3d 817, 819 (8th Cir.2002) (evidence of an escape is admissible to show consciousness of guilt in a trial of a separate charge), *cert. denied,* 537 U.S. 1178, 123 S.Ct. 1007, 154 L.Ed.2d 925 (2003); *United States v. Barnes,* 140 F.3d 737, 738 (8th Cir.1998) ("Evidence of flight or escape is admissible and has probative value as evidence of consciousness of guilt.").

■■■ Moreover, even if it is not intrinsic evidence of charged offenses, the evidence of an escape attempt is admissible pursuant to Rule 404(b), because it does demonstrate Honken's intent and plan to murder or tamper with witnesses. *See* FED. R.EVID. 404(b) (evidence of other crimes or acts is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident). The Eighth Circuit Court of Appeals has explained the scope of admissibility pursuant to Rule 404(b) as follows:

> While we have interpreted Rule 404(b) to be a rule of inclusion, *see United States v. Sykes,* 977 F.2d 1242, 1246 (8th Cir.1992), this interpretation does not give the government the unhindered ability to introduce evidence of prior crimes. Instead, the evidence of prior crimes must be 1) relevant to a material issue; 2) similar in kind and not overly remote in time to the charged crime; 3) supported by sufficient evidence; and 4) such that its potential prejudice does not substantially outweigh its probative value. *See United States v. Williams,* 308 F.3d 833, 837 (8th Cir.2002).

*United States v. Crenshaw,* 359 F.3d 977, 998 (8th Cir.2004). Here, the evidence of escape is relevant to a material issue, specifically, Honken's intent, plan, and motive to kill witnesses and to continue his drug-trafficking activities, and contrary to Honken's contentions, the court finds that it is supported by sufficient evidence. *Id.* (first and third requirements). It is also "similar in kind" to the extent that it is evidence of another attempt by Honken to harm witnesses against him, even after he was charged or incarcerated. *Id.* (second requirement); *see also People of Territory of Guam v. Tedtaotao,* 46 F.3d 1144, 1995 WL 40260, *1 (9th Cir.1995) (unpublished op.) (holding that evidence of a defendant's escape attempt was probative of his identity, preparation, plan, and intent to commit another crime, in that case, robbery).

■■■ Evidence admissible under Rule 404(b), however, remains subject to Rule 403's balancing of probative value and potential for unfair prejudice. *See Crenshaw,* 359 F.3d at 998 (fourth requirement of Rule 404(b) is that the probative value of the evidence outweigh its potential for prejudice); *see also Clark v. Martinez,* 295 F.3d 809, 814 (8th Cir.2002) (Rule 403 applies to evidence otherwise admissible pursuant to Rule 404(b)); *United States v. Mound,* 149 F.3d 799, 801–02 (8th Cir.1998) (same), *cert. denied,* 525 U.S. 1089, 119 S.Ct. 842, 142 L.Ed.2d 697 (1999). The court explained the probative value of this evidence above. Honken's contention that the evidence is more prejudicial than probative is based on his contention that the evidence of an actual attempt to escape is so weak and uncertain

that it would prejudice him by unfairly suggesting that he is "dangerous." The court rejects this argument, first, because the evidence that there was no "real" escape attempt, including evidence that Honken was never charged with a crime or jail rule violation for the attempt, goes to the weight, not the admissibility, of the evidence. Second, the court finds that the evidence is nowhere near as weak as Honken seems to assert, so that its probative value is very substantial. Third, the court has previously determined that the evidence of Honken's escape attempt *does* suggest his dangerousness, so that the inference of dangerousness is not "unfair" and certainly does not outweigh the probative value of the evidence.

Also contrary to Honken's argument, the court does not believe that the escape evidence should be excluded under Rule 403 on the ground that admitting any of the evidence will invite a distracting "mini-trial" on the nature of the escape attempt. *See* FED.R.EVID. 403 (evidence may also be excluded on the ground that its probative value is outweighed by confusion of the issues, undue delay, or waste of time). The probative value of the evidence to Counts 6 and 7 is substantial, and the government has represented that it intends to make focused use of the evidence on those counts, not a grand presentation of all of the assembled evidence relating to Honken's escape attempt. Honken can hardly complain of confusion or waste of time, if he expands the scope of the inquiry into the incident in an attempt to undermine the value of the evidence by demonstrating that the escape attempt was not a "real" escape attempt, is not supported by substantial evidence of conduct by him, or was never prosecuted as a crime or rule violation.

Therefore, that part of Honken's motion in limine seeking to bar evidence of his escape attempt will be denied.

## 2. Books seized from Honken's residence

Honken also seeks to exclude three books found on his bedroom closet shelf during a search of his house on February 7, 1996. The same search also led to the seizure of a methamphetamine laboratory, which was the basis for Honken's 1997 guilty plea to a charge of conspiring to manufacture methamphetamine. The first book is THE ANARCHIST COOKBOOK, copyright 1989. The government identifies the pertinent portion of the book as pages 98 through 103, which deal with manufacturing silencers for various types of firearms. The second book is THE POOR MAN'S JAMES BOND, copyright 1991. The government identifies the pertinent portions of this book as pages 35 through 37, which again explain ways to manufacture home-made silencers for firearms, and pages 414 through 417, which deal with tying and gagging people. The third book is THE SECRET AGENT HEADQUARTERS, which is a 17–page catalogue containing information for ordering surveillance transmitter kits and other surveillance equipment, communication equipment, weapons detection devices, countersurveillance equipment, night-vision and optical equipment, and other "security products."

### a. Arguments of the parties

Honken argues that these books and references to them should be excluded, because this evidence might imply that Honken had read the books and participated in activities described in them, but there is no evidence that either proposition is true. For example, he asserts that there is no evidence that he acted in a manner consistent with a secret agent or employed strategies or techniques outlined in any of the books, nor is there any evidence that the alleged murder victims were murdered with a weapon with a si-

lencer, either home-made or commercially manufactured. He also argues that this evidence does not help to prove any element of the crimes charged against him, but that even if it did, any probative value is substantially outweighed by the potential for unfair prejudice and misleading the jury.

The government, on the other hand, takes the position that the books are intrinsic evidence of the charged offenses, because they show that Honken took steps to educate himself about firearms and dangerous weapons. Thus, the government argues that some of the evidence is analogous to evidence that Honken possessed firearms and other dangerous weapons or surveillance equipment, which is probative of involvement in a drug enterprise. Similarly, the government argues that the books show that Honken took steps to educate himself about how to tie and gag people, and two of the alleged murder victims in this case were found bound and gagged in a manner suggested in THE POOR MAN'S JAMES BOND. The government also contends that there is evidence that a tech–9 firearm in Honken's possession had an attachment on the end of it consistent with a silencer, such that the evidence of books explaining how to make such silencers is probative of his involvement in the murders. The government points out that intent is an element of each of the crimes at issue here and that this evidence is probative of Honken's intent. In the alternative, the government contends that all of the evidence is admissible pursuant to Rule 404(b) to prove Honken's motive, intent, preparation, plan, knowledge, and absence of mistake.

### b. Analysis

 The court is not convinced by the government's argument that possession of books about tools of the drug trade is analogous to the possession of the *actual* tools of the drug trade, such that the evi-

dence of the books is "intrinsic" evidence of the charged crimes or "inextricably intertwined" with evidence of charged crimes. *See O'Dell,* 204 F.3d at 833 (defining "intrinsic" evidence); *Molina,* 172 F.3d at 1055 (same). On the other hand, the court agrees with the government that the evidence that Honken possessed these books is at least marginally probative of his knowledge, intent, planning, and preparation, because it does demonstrate his attempts to educate himself about firearms, silencers, and surveillance equipment, all of which are tools of the drug trade and potentially useful to kill or intimidate witnesses. Thus, this evidence may be admissible pursuant to Rules 402 and 404(b). Honken has not clearly articulated what unfair prejudice comes with this evidence, such that it should be excluded pursuant to Rule 403. *See Crenshaw,* 359 F.3d at 998 (admissibility under Rule 404(b) requires that the probative value of the evidence outweigh its potential for prejudice); *see also Martinez,* 295 F.3d at 814 (Rule 403 applies to evidence otherwise admissible pursuant to Rule 404(b)); *Mound,* 149 F.3d at 801–02 (same). His "prejudice" argument seems to be that the government intends to imply from his possession of the books that he had read them and acted in accord with conduct described in them, but there is no evidence that he ever read them or engaged in conduct described in them. This argument, the court finds, goes to the weight, not the prejudicial effect, of the evidence.

Therefore, that part of Honken's motion in limine seeking to exclude evidence that these three books were found on a shelf in his bedroom closet in 1996 will be denied.

### 3. The Ecstacy Cookbook

Honken also seeks to exclude evidence of another book, which he identifies as the ECSTACY COOKBOOK, offered by the govern-

ment as its Exhibit 72. The government explains that the book in question is entitled THE COMPLETE BOOK OF ECSTACY, and that it was also found on February 7, 1996, on the closet shelf in the southeast bedroom of Honken's house. The government explains that the book contains complete instructions for manufacturing ecstacy and the type of equipment necessary for the manufacturing process.

### a. Arguments of the parties

Honken argues that this book, and any mention of it, should be excluded, because it would confuse the jury and unfairly insinuate that Honken manufactured ecstacy, when he is not charged with any crime involving ecstacy. Thus, he seeks to exclude this evidence pursuant to Rule 403. The government, on the other hand, argues that evidence of the book is inextricably intertwined with evidence that Honken conspired to manufacture methamphetamine and was a leader of a continuing criminal enterprise. In the alternative, the government argues that it is admissible pursuant to Rule 404(b), because it shows Honken's motive, intent, plan, and absence of mistake in manufacturing and trafficking drugs.

### b. Analysis

The court is not at all convinced that possession of a book about ecstacy is in any way inextricably intertwined with, or even probative of, charges that Honken manufactured and trafficked in *other* controlled substances. To the extent that it is probative of trafficking in *other* controlled substances, the court thinks it is likely that it is (and, indeed, it better be, if the government is to make its case) cumulative of evidence of trafficking in those other controlled substances. *See* Rule 403 (probative evidence may be excluded on the ground that it is cumulative). Moreover, if the evidence is somehow probative on the issues asserted by the government, the

court finds that admission of this evidence is potentially unfairly prejudicial, and perhaps more important still, could potentially confuse and mislead the jury about what drugs and crimes are actually at issue in this case. *See* Rule 403 (probative evidence may be excluded on these grounds).

Therefore, that part of Honken's motion in limine seeking to exclude evidence of the ecstacy book will be granted.

### 4. Publications and order form purportedly seized from Honken's locker

### a. Underlying factual dispute

Honken also seeks to exclude evidence of several publications listed on an order form found in his locker at his place of employment on July 15, 1996, as well as the order form itself. *See* Defendant's Motion In Limine, ¶¶ 6–10. The publications at issue are identified as Government's Exhibits 231, 232, 233, and 234, and the order form itself is identified as Government's Exhibit 235. In support of this portion of his motion, Honken asserted that "[t]here is no evidence that the Defendant even received or read th[ese] magazine[s] or the other books on the order form." *See* Defendant's Memorandum In Support Of Motion In Limine at 7–9. Thus, Honken appeared to premise his argument on the belief that *only the order form* was found in his locker on July 15, 1996. On the other hand, the government initially maintained that three publications were actually found in the locker (THE RUGER 1022 EXOTIC WEAPONS SYSTEM, HOW TO MAKE DISPOSABLE SILENCERS, and FULL-AUTO CONVERSION OF THE SKS RIFLE) and that the locker also contained an order form for the purchase of these three publications as well as a fourth publication (HOW TO MAKE A SILENCER FOR A .22). The government maintained that the locker also contained an invoice, identified as

Government's Exhibit 236, which Honken has not moved to exclude, for the purchase of three books on explosives and bomb-making and another copy of THE POOR MAN'S JAMES BOND. *See* Government's Resistance To Defendant's Motion In Limine (docket no. 297) at 11–12. Thus, there appeared to be an underlying factual dispute about what was actually found in Honken's locker on July 15, 1996. The court concluded that resolution of such a factual dispute was material to disposition of this part of Honken's motion in limine. Therefore, the court notified the parties by order dated July 14, 2004, that it would hear additional argument and, if necessary, receive additional evidence, on that portion of Honken's motion in limine seeking to exclude the fruits of the search of the defendant's locker on July 15, 1996, at a hearing already scheduled on another matter for July 15, 2004.

At the supplemental hearing on this part of Honken's motion in limine on July 15, 2004, the government represented that it had made a mistake, because no books were found in Honken's locker, only the order form, Government's Exhibit 235, and the invoice, Government's Exhibit 236. The government had, itself, obtained copies of the books identified as Exhibits 231 through 234. In view of the prosecutor's clarified understanding of the situation, the government withdrew Exhibits 231 through 234. The government represented that Honken had not challenged the admissibility of the order form Exhibit 235 and Honken did not object to that representation, notwithstanding that he had, indeed, originally moved to exclude the order form as well as the books listed on it. *See* Honken's Motion In Limine, ¶ 10. It is not clear to the court whether Honken intended to withdraw his motion to exclude the order form in light of the government's

withdrawal of Exhibits 231 through 234. Therefore, to ensure that Honken's objections to evidence have been adequately considered, the court will assume that Honken continues to challenge admissibility of the order form.[3]

### b. Arguments of the parties

In Honken's brief in support of his motion in limine, Honken asserts that the order form should be excluded at trial, because there is no evidence that Honken placed the order for the listed publications, received them, or read them. Thus, Honken argues that the evidence of the order form does nothing to prove any element of the crimes charged. Moreover, he contends that evidence of the order form would be unfairly prejudicial, because it might cause the jury to draw the unsupported inference that Honken did purchase and read the materials. The government counters that this evidence is, again, intrinsic and direct evidence of the crimes charged in Counts 6 and 7, as evidence of intent to murder witnesses. In the alternative, the government argues that, at the very least, the order form is admissible pursuant to Rule 404(b) as evidence of motive, intent, preparation, and plan to murder witnesses.

### c. Analysis

■■■ The court is not convinced by the government's argument that possession of an order form for publications about tools of the drug trade or tools useable to murder or intimidate witnesses is analogous to the possession of the *actual* tools, such that the evidence of the order form in Honken's locker is "intrinsic" evidence of the charged crimes or "inextricably intertwined" with evidence of charged crimes. *See O'Dell*, 204 F.3d at 833 (defin-

---

**3.** There has never been a challenge, so far as the court can see, to the admissibility of the invoice found in Honken's locker and identified as Government's Exhibit 236.

ing "intrinsic" evidence); *Molina*, 172 F.3d at 1055. (same). On the other hand, the court finds that the order form for such publications is evidence of motive, intent, plan, and preparation to commit crimes using the tools and techniques identified in the titles of the ordered publications in the same way that evidence of an attempt to acquire a "recipe" for a controlled substance is evidence of intent to manufacture that controlled substance. *See, e.g., United States v. Weston*, 4 F.3d 672, 674–75 (8th Cir.1993) (identifying evidence that might have been sufficient to demonstrate intent to manufacture as evidence that the defendant knew how to manufacture methamphetamine or knew someone who had the knowledge to manufacture methamphetamine). Honken's argument that there is no evidence that he placed the order for the publications listed on the order form goes to the weight of the evidence of the order form, but it does not demonstrate that the order form has no probative value. Although the order form does not show Honken's knowledge of the *contents* of the books listed on it, it does, itself, indicate motive, intent, preparation, and plan to learn about or acquire tools that would be useful to drug trafficking or the murder and intimidation of witnesses. *See* Fed.R.Evid. 404(b) (evidence of bad acts may be admissible to show, *inter alia*, motive, intent, preparation, and plan). Thus, the probative value of the order form simply does not depend upon whether or not Honken received or read the publications listed.

Similarly, because the order form is itself evidence of motive, intent, preparation, and plan, the possibility of an inappropriate inference that the order form shows knowledge of the contents of the books can be overcome by an appropriate instruction. Thus, Honken's "prejudice" argument under Rules 404(b) and 403 is unavailing as to the admissibility of the order form. *See Crenshaw*, 359 F.3d at 998 (fourth require-

ment of Rule 404(b) is that the probative value of the evidence outweigh its potential for prejudice); *Clark*, 295 F.3d at 814 (Rule 403 applies to evidence otherwise admissible pursuant to Rule 404(b)); *Mound*, 149 F.3d at 801–02 (same).

Therefore, although this part of Honken's motion in limine will be granted as to the publications identified as Government's Exhibits 231, 232, 233, and 234, upon the government's withdrawal of those exhibits, it will be denied as to the order form identified as Government's Exhibit 235.

### 5. Testimony of former attorney

■ Next, Honken seeks to exclude evidence of conversations that he had with his former attorney, David Thinnes. The government explains that the conversations apparently revolved around a videotape that Honken gave Mr. Thinnes in 1993 showing Gregory Nicholson making statements exculpating Honken from crimes with which he was then charged. Mr. Thinnes testified before a grand jury in 1999 to the effect that the tape existed, that he watched it, what was on the tape, and that he had conversations with Honken about the tape, where it came from, how it could be used to defend him against pending charges, its admissibility, and like issues.

#### a. Arguments of the parties

Honken contends that the evidence of his conversations with Mr. Thinnes should be excluded to protect the sanctity of attorney-client privilege. In addition, he contends that this evidence should be excluded pursuant to Rule 403, because of the unfair prejudice that would arise from his former attorney testifying against him, citing *United States v. Cochran*, 546 F.2d 27, 29 n. 5 (5th Cir.1977). The government contends that the admissibility of this evidence is *res judicata* and law of the

case, because Mr. Thinnes was compelled to testify before the grand jury after motions to quash a subpoena were denied by the district court under the "crime-fraud" exception and that ruling was affirmed by the Eighth Circuit Court of Appeals. *In re Grand Jury Subpoena*, 187 F.3d 996, 997 (8th Cir.1999). The government maintains that it does not intend to inquire into any area that was not covered by the order compelling Mr. Thinnes's testimony before the grand jury. The government also argues that the probative value of the evidence is overwhelming and that Honken should not be able to complain of prejudice where he placed his attorney in the position of testifying by involving him in the commission of a crime.

### b. Analysis

 The court's analysis of this issue is necessarily brief. The court agrees with the government that the district court and the Eighth Circuit Court of Appeals have already ruled on the permissible scope of Mr. Thinnes's testimony under the "crime-fraud" exception. Nor is the court persuaded by Honken's Rule 403 argument. The case on which he relies, *United States v. Cochran*, 546 F.2d 27 (5th Cir.1977), states the following, in pertinent part:

> Although we find no error in the use of the former attorney's testimony, we do not applaud the practice here indulged. The mere appearance of an attorney testifying against a former client, even as to matters of public record, is distasteful *and should only be used in rare instances*.

*Cochran*, 546 F.2d at 29 n. 5 (emphasis added). The "crime-fraud" exception is such a "rare instance." The "crime-fraud" exception provides that the attorney-client privilege " 'does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime.' " *In re BankAmerica Corp. Sec. Litig.*, 270 F.3d 639, 641 (8th Cir.2001)

(quoting *United States v. Zolin*, 491 U.S. 554, 563, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989)). Just as a defendant should not be able to invoke the attorney-client privilege for conduct covered by the exception, he should not be able to assert that he is unfairly prejudiced by admission of the attorney's testimony falling within that exception.

Therefore, that part of Honken's motion in limine seeking to exclude testimony by his former attorney will be denied.

### 6. Honken's membership in the Odinists

#### a. Arguments of the parties

 Finally, Honken seeks to exclude evidence that, while he has been in prison, he has allegedly been a member of a religious group called the "Odinists." Honken contends that this evidence has no relevance to any issue before the jury and that there is no evidence that the Odinists or any Odinists have committed any unlawful or violent acts having anything to do with the charges against him. If this evidence has any relevance at all, Honken contends, it would be in the penalty phase only. Thus, he contends that the evidence is not relevant, or if somehow relevant, is nevertheless unfairly prejudicial, and should be excluded. At the oral arguments, Honken added that reference to his affiliation with a religious group would violate his First Amendment rights.

The government responds that the Odinists are not only a religious organization recognized by the Federal Bureau of Prisons, but an organization believed to be a front for prisoners who believe in white supremacy, promote violence against Jews and minorities, and are involved in violence against prisoners believed by the members to be cooperating with the government. The government contends that this evidence is relevant at the guilt phase as

demonstrating Honken's connection to government witnesses and as an explanation for why he would divulge incriminating evidence to members of the group. The government also asserts that the evidence is admissible at the penalty phase as it is relevant to Honken's future dangerousness, which is a proper aggravating factor in a death penalty case.

At the oral arguments, the parties agreed that express reference to the "Odinists" would not be admissible and that the organization would, instead, be referred to, if at all, as "a religious organization meeting in the prison."

### b. Analysis

 The court finds that evidence that Honken met certain associates through "a religious organization meeting in the prison" is relevant at the guilt phase of the trial to demonstrate the associations and to provide an explanation of the circumstances and nature of the relationship, including why Honken might have been willing to divulge incriminating information to members of the group. Thus, such information is relevant and admissible pursuant to Rules 401 and 402. Moreover, with the agreement to refer to the "Odinist" as "a religious organization meeting in prison," and with the further caveat that the religious tenets of the group are off limits, the court finds no potential for unfair prejudice barring admission of the evidence under Rule 403. At the penalty phase, if any, should the government lay a proper foundation that the "Odinists" are, indeed, white supremacists and do have a history of violence towards minorities, other religious groups, or cooperating witnesses, then that evidence will also be relevant and admissible on the issue of Honken's future dangerousness. However, the government should first make a proffer of such foundation evidence out of the hearing of the jury, so that Honken can make any appropriate objections.

Therefore, the evidence of Honken's membership in the "Odinists" is admissible within the limits stated above and subject to the parties' agreement concerning the way in which the group will be identified. Honken's motion to exclude such evidence will be denied.

### III. CONCLUSION

Upon the foregoing, and as stated more fully therein, the parties' pre-trial motions on evidentiary matters are resolved as follows (in docket order):

1. The government's May 28, 2004, Motion In Limine Regarding Cutkomp's Instances Of Public Exposure (docket no. 263) is **granted** to the extent that the parties, counsel, and witnesses may not make any reference to, ask questions concerning, or introduce evidence of witness Timothy Cutkomp's past behavior of indecent exposure, but they may refer to these instances as "a misdemeanor conviction" and "acts constituting misdemeanor violations of the law" that caused Cutkomp to see a psychiatrist or that Cutkomp may have failed to disclose fully to law enforcement officers.

2. The government's June 1, 2004, Request For Hearing And Pretrial Ruling Regarding Admissibility Of Out Of Court Statements Made By Decedents Nicholson And DeGeus (docket no. 264) is **granted** as follows:

a. DeGeus's statements will be admissible at trial, either pursuant to Rule 803(3), or conditionally, pursuant to Rule 804(b)(6) and the procedures outlined in *United States v. Emery*, 186 F.3d 921, 926–27 (8th Cir.1999), *cert. denied*, 528 U.S. 1130, 120 S.Ct. 968, 145 L.Ed.2d 839 (2000), or both; and

b. Nicholson's statements will also be conditionally admitted, pursuant to Rule 804(b)(6) and the procedures outlined in *Emery*.

3. The government's June 14, 2004, Motion In Limine To Bar Discussion Or Evidence Of Certain Aspects Of The Death Penalty (docket no. 278) is **granted** with the specific exceptions noted above in Section II.3.b. of this ruling.

4. The defendant's June 18, 2004, Motion In Limine (docket no. 288) is **granted in part** and **denied in part** as follows:

a. That part of Honken's motion in limine seeking to bar evidence of his escape attempt is **denied;**

b. That part of Honken's motion in limine seeking to exclude evidence of THE ANARCHIST COOKBOOK, THE POOR MAN'S JAMES BOND, THE SECRET AGENT HEADQUARTERS, found on a shelf in his bedroom closet in 1996, is **denied;**

c. That part of Honken's motion in limine seeking to exclude evidence of THE COMPLETE BOOK OF ECSTACY is **granted;**

d. That part of Honken's motion seeking to exclude publications listed on an order form and the order form itself found in his locker on July 15, 1996, is **granted** as to the publications identified as Government's Exhibits 231, 232, 233, and 234, upon the government's withdrawal of those exhibits, but is **denied** as to the order form identified as Government's Exhibit 235;

e. That part of Honken's motion in limine seeking to exclude testimony by his former attorney is **denied;**

f. That part of Honken's motion in limine seeking to exclude evidence of his membership in the "Odinists" is **denied,** and such evidence is admissible within the limits stated above in Section II.B.6 and subject to the parties' agreement concerning the way in which the group will be identified.

5. The government's June 22, 2004 Motion To Exclude Expert Evidence From Michael Gelbort (docket no. 289) is **denied**

subject to the conditions set by the court during the July 1, 2004, oral arguments.

6. The government's June 22, 2004, Motion In Limine To Exclude Evidence From Lisa Rickert (docket no. 292) is **denied** subject to the conditions set by the court during the July 1, 2004, oral arguments.

**IT IS SO ORDERED.**